**MID–SOUTH INSURANCE CO., Plaintiff,**

v.

**John DOE, Jane Doe, Frank Roe, Mary Roe, and Celtic Insurance Co., Defendants.**

No. 2:02–1789–18.

United States District Court, South Carolina, Charleston Division.

July 28, 2003.

Ronald K. Wray, II, Andrea Moore Hawkins, Greenville, SC, for Plaintiff.

Linda C. Garrett, Lawrence Alexander Laddaga, North Charleston, SC, Stephen

P. Groves, Brad Waring, Charleston, SC, for Defendants.

## MEMORANDUM OPINION AND ORDER

NORTON, District Judge.

This matter is before the court on cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## I. Background

The parties have stipulated to the following facts. John Doe and Jane Doe (the "Does") are husband and wife and are citizens and residents of Mt. Pleasant, South Carolina. Frank Roe and Mary Roe (the "Roes") are husband and wife and also are citizens and residents of Mt. Pleasant, South Carolina. Jane Doe and Mary Roe are sisters. Mid–South Insurance Company ("Mid–South") and Celtic Insurance Company ("Celtic") are both out-of-state insurance companies. Mid–South issued a Comprehensive Major Medical Policy of insurance ("Mid–South Policy") to John Doe as the primary insured. The Mid–South Policy also provided coverage to Jane Doe, as an additional insured, in accordance with the terms and provisions of the policy.[1] Frank and Mary Roe were insured under the terms and provisions of a CeltiCare Select PPO Plan/CeltiCare Plus Option ("Celtic Policy") issued by Celtic Insurance Company ("Celtic"). Both the Mid–South Policy and the Celtic Policy were in force and effect during all times relevant to this action.

On or about May 24, 2001, Jane Doe, John Doe, Frank Roe, and Mary Roe entered into a Gestational Surrogate Agreement ("Surrogacy Agreement"), under which an embryo generated from the sperm of Frank Roe and an egg from Mary Roe would be implanted in Jane Doe's uterus for purpose of allowing Jane Doe to carry and deliver a child for the Roes. The Surrogacy Agreement further provided that upon the birth of the child, the Roes would have full legal parental rights to the child carried by Jane Doe, including the right to take the child home from the hospital. The Roes also were entitled to retain physical custody of the child.

In accordance with the terms of the Surrogacy Agreement, the embryo was implanted in Jane Doe's uterus. Jane Doe subsequently became pregnant as a result of the implantation and delivered a child, Brenda Roe, on or about January 12, 2002. Brenda Roe is the biological child Frank Roe and Mary Roe. Brenda Roe is not the biological child of John Doe and Jane Doe.[2] Following her birth, Brenda Roe remained in the Neonatal Intensive Care for approximately two months, at which time she was released to the custody of the Roes. She has remained in the custody of the Roes since then.

Frank Roe and Mary Roe filed an action in the Charleston County Family Court alleging that they were the biological parents of Brenda Roe and seeking an order to change Brenda Roe's birth certificate to reflect that they were her parents. *John Roe and Mary Roe v. Baby Girl Doe, an infant under the age of one(1) year,* C.A. No.2002–DR–10–1763 (filed Apr. 24, 2002).[3] In support of this action, Jane Doe executed an affidavit acknowledging and

---

1. As will be explained further below, Jane Doe was covered under the Mid–South Policy as a "dependent" of John Doe.

2. Although the parties stipulated that the Does do not have any genetic relationship to Brenda Roe, it appears that Brenda Roe is the niece of Jane Doe, her surrogate mother, because Jane Doe and Mary Roe are sisters.

3. The caption of the family court case uses the fictitious name of John Roe, who is the same person as Frank Roe in this action.

affirming that Brenda Roe was the child of Frank Roe and Mary Roe. On January 14, 2003, Frank and Mary Roe amended their complaint to seek an order of adoption for Brenda Roe. On March 20, 2003, the family court issued a decree ordering that Frank and Mary Roe had adopted Brenda Roe and were her legal and natural parents ("Adoption Order").

The Does have submitted claims to Mid–South for payment of expenses related to the medical care provided to Brenda Roe and for the medical care and treatment provided to Jane Doe relating to the delivery of Brenda Roe. Mid–South has not paid these claims. Further, the Roes have submitted claims to Celtic for Brenda Roe's medical expenses.

Mid–South filed this action against John Doe, Jane Doe, Frank Roe, Mary Roe (collectively the "Insureds") and Celtic seeking a declaratory judgment that the claims submitted for the medical expenses provided to Jane Doe and Brenda Roe are not covered under the Mid–South Policy. John Doe and Jane Doe filed a counterclaim against Mid–South alleging that its failure to pay Jane Doe's medical expenses under the Mid–South Policy was a bad faith refusal to pay benefits. Frank and Mary Roe asserted a cross-claim against Celtic seeking a declaratory judgment that the Celtic Policy covered Brenda Roe's medical claims. Mid–South dismissed its claim against Celtic by consent. Mid–South, the Insureds, and Celtic then filed cross-motions for summary judgment on all claims.

## II. Summary Judgment Standard

Summary judgment shall be granted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Fed.R.Civ.P. 56(c). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "There is no requirement that the trial judge make findings of fact." *Id.* at 250, 106 S.Ct. 2505. Rather, the threshold inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* "In other words, to grant summary judgment the court must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir.1990). An issue of fact concerns material facts only if establishment of the fact might affect the outcome of the lawsuit under governing substantive law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. All facts and reasonable inferences therefrom are viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R.Civ.P. 56(c)). Once this burden has been met, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there

is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(c), (e)); *see also Pleasurecraft Marine Engine Co. v. Thermo Power Corp.*, 272 F.3d 654, 658 (4th Cir.2001).

## III. Analysis

### A. The Mid–South Policy Does Not Provide Coverage for Medical Services Provided to Brenda Roe.

Under the Mid–South Policy, "covered persons" are defined as the primary insured[4] and their "dependent(s)." (Pl's Ex. A at 10.) "Dependent" is defined as the primary insured's "spouse and children." (*Id.*) "The word 'child' means your natural child, step child, or adopted child." (*Id.*) Mid–South argues that Brenda Roe is not the "child" of the Does under the terms of the policy. The Does argue that the definition of "natural child" is ambiguous under the policy and therefore should be interpreted to include a child born to Jane Doe in a surrogate pregnancy.

"An insurance contract is subject to the general rules of contract construction." *Hansen ex rel. Hansen v. United Services Auto. Ass'n*, 350 S.C. 62, 565 S.E.2d 114, 116 (2002) (internal citation omitted). "The purpose of all rules of construction is to ascertain the intention of the parties to the contract." *Bruce v. Blalock*, 241 S.C. 155, 127 S.E.2d 439, 442 (1962). "Where the terms of a contract are clear and unambiguous, its construction is for the court; but where the terms are ambiguous, the question of the parties' intent must be submitted to the jury." *Hansen*, 565 S.E.2d at 116 (internal citation omitted). "A contract is ambiguous when it is

capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Hawkins v. Greenwood Dev. Corp.*, 328 S.C. 585, 493 S.E.2d 875, 878 (1997) (internal citation omitted). "A contract is ambiguous only when it may fairly and reasonably be understood in more ways than one." *Hansen*, 565 S.E.2d at 117 (internal citation and punctuation marks omitted). "In construing an insurance contract, all of its provisions should be considered, and one may not, by pointing out a single sentence or clause, create an ambiguity." *Id.* "Where language used in an insurance contract is ambiguous, or where it is capable of two reasonable interpretations, that construction which is most favorable to the insured will be adopted." *Poston v. Nat'l Fid. Life Ins. Co.*, 303 S.C. 182, 399 S.E.2d 770, 772 (1990) (internal citations omitted).

█ First, the Does argue that "[b]ecause the term 'natural child' is used in the same sentence as 'step child' and 'adopted child', it is unclear as to whether the policy establishes coverage for a child based strictly on genetic ties or based on the legal status between the policyholder and the child." (Insureds' Mem. Supp. Summ. J. at 4.) The Does are correct that the definition of "child" encompasses children with no biological or genetic ties to the parents. However, it would not be reasonable to infer that the definition of "child" under the Mid–South Policy was intended to be based on legal status of the children.[5]

---

4. Page 1 of the Mid–South Policy explains that "you" refers to the policyholder (i.e. the primary insured), which is John Doe.

5. If any inference is to be made from this definition, it is that they are all "dependent" on the policyholder. This is evident from the

requirement that they be unmarried. In this case, Brenda Doe was not "dependent" on the Does because the Roes immediately took custody of her.

Rather, the unambiguous language of the policy states that the definition of "child" is limited to three relationships: "natural child, step child, and adopted child." (Pl's Ex. A at 10.) Thus, to be a "child" under the Mid–South Policy, Brenda Roe must be the natural child, step child, or adopted child of John Doe.

Second, the Does argue that the term "natural child" is ambiguous under the Mid–South Policy because it could be interpreted to include Brenda Roe as a child born to Jane Doe in a surrogate pregnancy.[6] In other words, the Does argue that "because the [Mid–South] [P]olicy fails to define the term 'natural child,' it leaves open the question, in the surrogacy context, whether a baby born as a result of third party Assisted Reproductive Technology (A.R.T.)/gestational surrogacy is the natural and/or legal child of the woman who gives birth to the child or the natural and/or legal child of the woman who provides the genetic material." (Insureds' Mem. Supp. Summ. J. at 4.) Mid–South responds that Brenda Roe is not the "natural child" of John Doe or Jane Doe because "natural child" means "biological child" and parties have stipulated that Brenda Doe is not the "biological child" of the Does.

■ As an initial matter, the Does' argument that a baby born in a surrogate pregnancy may be the "natural child" of the "woman who gives birth to the child" confuses the issue in this case. John Doe was the primary insured under the Mid–South policy; therefore, the issue before this court is whether Brenda Roe is *his* "natural child" and therefore his "dependent" under the terms of the Mid–South Policy. (Pl's Ex. A at 10.) Contrary to the Does' argument, the issue is not whether Brenda Roe was the "natural child" of Jane Doe, the surrogate mother, because she is also a "dependent" of John Doe under the Mid–South Policy.

Under the facts of this case, no reasonable person could interpret the Mid–South Policy as including Brenda Roe as a "natural child" of John Doe. Rather, the textual context and ordinary usage of the term "natural child" show that it was intended to refer to a "biological child." As explained above, the term "natural child" was included as one of three types of "child" listed in the Mid–South Policy along with "step child" and "adopted child." (*Id.*) This definition therefore contrasts "natural child" with other possible non-biological parent-child relationships. Moreover, South Carolina courts equate the term "natural child" with "biological child" in the context of child custody cases and use the terms interchangeably. *See, e.g., Moore v. Moore,* 300 S.C. 75, 386 S.E.2d 456 (1989) (explaining that the "biological" or "natural" parents have a rebuttable presumption of legal custody against others in possession of the child).

■ The Does argue that the term "natural child" is ambiguous because of the unusual nature of a surrogate pregnancy. However, the Surrogacy Agreement specifically states that the Roes are the "natural mother and father" of Brenda Roe. (Surrogacy Agreement ¶ 4(b), Pl's Ex. C. at 6.) Thus, prior to this insurance dispute, the Does have admitted that Brenda Roe was not their "natural child." Further, although this court is not aware of any decision in which a South Carolina court has specifically addressed the definition of "natural child" in the context of a surrogate pregnancy, courts in other jurisdictions have repeatedly held that the biological parents are the natural and legal

---

**6.** The Does do not argue that Brenda Roe is their "step child" or an "adopted child" of the Does.

parents of a child born in a surrogate pregnancy. In *Belsito v. Clark,* 67 Ohio Misc.2d 54, 644 N.E.2d 760 (1994), the biological parents brought an action seeking a declaratory judgment ordering that they be declared the "natural and legal parents" of child carried by a surrogate host. The court held that because the biological parents were the "natural and legal parents" of the child, they had all legal rights and responsibilities of a parent-child relationship, adoption was not necessary, and the birth certificate should reflect their status as parents. *Id.* at 767–68. *See also, e.g., Culliton v. Beth Israel Deaconess Med. Ctr.,* 435 Mass. 285, 756 N.E.2d 1133 (2001). Thus, the Surrogacy Agreement and judicial opinions addressing the issue lead this court to conclude that Brenda Roe is the "natural child" of her biological parents, Frank and Mary Roe.

The Does argue that the South Carolina Family Court's Adoption Order implicitly concluded that Brenda Roe was the legal and natural child of the Does until she was adopted by the Roes; otherwise, the Adoption Order would be unnecessary because the Roes would not be required to adopt a child that already was legally theirs. The Adoption Order carries very little precedential weight because of its procedural posture. The family court allowed the Roes to amend their complaint to seek an adoption rather than a declaratory judgment that they were Brenda Roes's parents. Although it is not clear, because the adoption was uncontested, it appears that this may have been an expedient way for the Roes to gain legal status of Brenda Roe without requiring the court to determine the legal status of a child born in a surrogate pregnancy under South Carolina law. Thus, by amending their complaint, the Roes never required the family court to actually decide the issue of whether Brenda Roe was their natural child, but rather assumed that she was not. More-

over, the Adoption Order was an unpublished order with very little analysis.

■ However, even if this Adoption Order were interpreted as holding that Brenda Roe was the Does' natural child before the adoption, it is now clear based on the stipulated facts in this case that Brenda Roe was not the "natural child" of John Doe. That is, although it is contrary to the holding of other courts addressing the issue, the family court reasoned that Jane Doe was Brenda Roe's natural mother because she was "actually born of" her. (Celtic Ex. 1 at 2.) However, the Adoption Order did not discuss the status of John Doe because it was an uncontested adoption proceeding and his status was not at issue. Accordingly, the court apparently presumed that he was Brenda Roe's natural father under South Carolina law because there is a rebuttable presumption that the husband of the child's mother is the child's father. *Chandler v. Merrell,* 291 S.C. 224, 353 S.E.2d 133 (1987). Yet the parties have stipulated that John Doe was not the biological father of Brenda Roe, which rebuts any presumption that he was her natural father. *See Barr's Next of Kin v. Cherokee, Inc.,* 220 S.C. 447, 68 S.E.2d 440 (1951). Thus, the Adoption Order is not precedent under South Carolina law that a child born in a surrogate pregnancy is the surrogate mother's husband's "natural child" when he has no biological relationship to the child.

■ In sum, the term "natural child" refers to a parent's "biological child." The term "natural child" is arguably ambiguous with respect to the surrogate mother because a reasonable person could construe the term to include a child born to her through a surrogate pregnancy. However, no reasonable interpretation of the term "natural child" would include the child of the surrogate mother's husband when he has no biological relationship to

the child and has entered into a contract stating that he is not the natural father of the child. As a result, Brenda Roe is not the "child" of John Doe because she is not his "natural child, step child, or adopted child." Therefore, she is not his "dependent" and is not a "covered person" under the Mid–South Policy.

### B. The Mid–South Policy Provides Coverage for Medical Services Provided to Jane Doe for Complications Arising out of the Surrogate Pregnancy.

■ Mid–South has moved for summary judgment on the grounds that the Mid–South Policy does not provide coverage for Jane Doe's medical expenses. The Does argue that although the Mid–South Policy does not cover routine pregnancy costs, it covers "complications of pregnancy." (Pl's Ex. A at 28.) The Does list several complications that Jane Doe suffered and seek a declaratory judgment that these were covered under the Mid–South Policy. Mid–South does not contest that Jane Doe's expenses were "complications of pregnancy" under the Mid–South Policy. Rather, Mid–South argues that Jane Doe's medical costs from her complications during the surrogate pregnancy are not covered for two reasons.

First, Mid–South argues that the medical expenses incurred by Jane Doe during the delivery of Brenda Roe are not covered because the Mid–South Policy provides that it is not for the benefit of third-parties. The Mid–South Policy states that "[t]his Policy is for Your Benefit Only." (Pl's Ex. A at 44.) It further explains that the policy "is not for any other person or entity's benefit," and "[n]o one else . . . may assert any rights based on this policy." (Pl's Ex. A at 44.) Mid–South argues that Jane Doe's medical costs are covered under this third-party language because the Surrogacy Agreement provided that "sole purpose of the in vitro fertili-

zation . . . and the conception of the birth [sic] of the child is to provide a child to the [Roes]." (Surrogacy Agreement ¶ 4(c), Pl's Ex. Ex. C at 7.) Although the Surrogacy Agreement was generally designed to benefit the Roes by allowing them to have a child, the medical services performed on Jane Doe to treat her for complications arising out of the surrogate pregnancy were for her benefit because they were performed at least in part to protect her health. Therefore, these medical services for the benefit of Jane Doe and are not excluded by the third-party language.

■ Second, Mid–South argues that it should not be required to pay for Jane Doe's medical bills because the Surrogacy Agreement provided that "in the event . . . health insurance is not available to the [Does,]" the Roes would pay for any "maternity and birth costs." (Surrogacy Agreement ¶ 6(b), Pl's Ex. C at 10.) However, this contractual obligation is plainly contingent on the lack of coverage under the Does' Mid–South Policy. Thus, the Mid–South policy provides coverage for Jane Doe's complications during her pregnancy and the Surrogacy Agreement does not provide otherwise.

### 1. Bad Faith

■ The Does also have asserted a bad faith refusal to pay counterclaim against Mid–South for failure to pay Jane Does' medical bills. The elements of a cause of action for bad faith refusal to pay first party benefits under a contract of insurance are as follows (1) the existence of a mutually binding contract of insurance between the plaintiff and the defendant; (2) refusal by the insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or unreasonable action in breach of an implied covenant of good faith and fair dealing arising on the contract; (4) causing damage to the in-

sured. *Crossley v. State Farm Mut. Auto. Ins. Co.*, 307 S.C. 354, 415 S.E.2d 393, 396–397 (1992) (internal citation omitted). "If these elements are pleaded and proved, the insured's remedy is not limited to the face amount of the contract. If the insured proves the insurer's conduct was willful or in reckless disregard of his rights under the contract, the insured also may recover punitive damages." *Id.* With respect to the third element, "there is an implied covenant of good faith and fair dealing in every insurance contract 'that neither party will do anything to impair the other's rights to receive benefits under the contract.'" *Tadlock Painting Co. v. Maryland Cas. Co.*, 322 S.C. 498, 473 S.E.2d 52, 53 (1996) (quoting *Nichols v. State Farm Mut. Auto. Ins. Co.*, 279 S.C. 336, 306 S.E.2d 616, 618 (1983)). The classic statement of law in a bad faith action is that "[i]f there is a reasonable ground for contesting a claim, there is no bad faith in the denial of it." *Crossley*, 415 S.E.2d at 397. The Does argue that Mid–South cursorily denied her claim without any regard for her rights under the policy. Mid–South argues that it did not act in bad faith by denying Jane Doe's claims because they were incurred in the unusual circumstances of a surrogate pregnancy and therefore it was reasonable for it to seek a declaration of rights under the contract. Although this court is not persuaded by Mid–South's reasons for denying

payment to Jane Doe for her medical bills, Mid–South had a reasonable ground for contesting her claim because of the novel issues of surrogate pregnancies. Thus, the Does' claim for bad faith refusal to pay benefits fails.

### C. The Celtic Policy Provides Coverage for the Medical Services Provided to Brenda Roe for the First Thirty–One Days After Her Birth.

■ Celtic argues that Brenda Roe is not covered under the Celtic Policy because she does not meet the policy's requirements for "Newborn Children."[7] (Celtic Ex. 3 at 13.) First, Celtic argues that Brenda Roe was not covered for the initial thirty-one day period after her birth because she does not "meet the definition of *dependent*." (*Id.*) This argument fails at the outset because the Celtic Policy does not require that a child meet the definition of "dependent" for the initial thirty-one day period. (*Id.*) Rather, the Celtic Policy provides that "[c]hildren born to an *insured person*[8] while this *policy* is in force will be insured without evidence of insurability from the moment of birth for an initial 31 day period." (*Id.*) It is debatable as to whether Brenda Roe was "born to" the Roes under the surrogate pregnancy. Taken literally, she was "born to" Jane Doe because she actually delivered her. However, another reasonable inter-

---

**7.** The "Newborn Children" provision in its entirety is as follows:

Children born to an *insured person* while this *policy* is in force will be insured without evidence of insurability from the moment of birth for an initial 31 day period. For eligibility to continue after the initial 31 day period, children born to an *insured person* must meet the definition of *dependent*. *You* must notify *us* of the birth within 31 days after the birth and pay any additional required premium. If *you* do not notify *us* of the birth of such children or fail to pay the additional required premium,

their coverage will end 31 days after the birth. If *you* later wish to add such children, their coverage will be subject to *our* eligibility requirements, regular underwriting guidelines, and the payment of any required premium.

(Celtic Policy at 13 (emphasis in original).)

**8.** The Celtic Policy's definition of "insured person" specifically includes both the primary insured person and his dependents. (Celtic Ex. 3 at 7–8.) Celtic does not contest that Frank and Mary Roe are "insured persons" under this policy.

pretation of policy is that Brenda Roe was "born to" the Roes because she is their natural and biological child. Therefore, this ambiguity should be construed against the insurer. *Poston,* 399 S.E.2d at 772. Brenda Roe therefore was covered under the Celtic Policy for the initial thirty-one day period "without evidence of insurability." (Celtic Ex. 3 at 13.)

The Celtic Policy requires, however, that a child born to an insured meet the definition of "dependent" in order to be insured after the initial thirty-one day period. Under the Celtic Policy, a "dependent" is defined as "a lawful spouse or unmarried child of the primary insured person." (*Id.* at 5.) The policy further explains that an "unmarried dependent child *includes* step child, legally adopted child and child in custody of the primary insured person as a result of an interim court order of adoption." (*Id.* (emphasis added)) Celtic argues that Brenda Roe is not an "unmarried dependent child" because she is not Frank Roe's "step child," "legally adopted child," or "child in custody of the primary insured person as a result of an interim court order of adoption." However, the definition of "unmarried dependent child" states that it "includes" these categories of children. It was not intended to be an exhaustive list of all types of dependent children eligible under the policy. This is obvious because under Celtic's interpretation of the policy, step children and certain adopted children would be "dependents" but natural biological children would not. There is no evidence that the Celtic Policy was intended to implement such a bizarre coverage scheme. Therefore, the Celtic Policy should be interpreted according to its plain language, which indicates that "unmarried dependent children" are covered under the policy, "including" step children and certain adopted children. Thus, a reasonable interpretation of the Celtic Policy would include Brenda Roe as a "dependent."

Although Brenda Roe would be covered as a "dependent" under the Celtic Policy after the initial thirty-one day period, she lost her coverage 31 days after her birth because the Roes did not notify Celtic of her birth. The Celtic Policy provides that "[i]f *you* do not notify *us* of the birth of such children or fail to pay the additional required premium, their coverage will end 31 days after the birth." (*Id.* at 13.) Further the Celtic Policy provides that "[i]f *you* later wish to add such children, their coverage will be subject to *our* eligibility requirements, regular underwriting guidelines, and the payment of any required premium." (*Id.*) Celtic has presented uncontroverted evidence that the Roes failed to notify Celtic of Brenda Roe's birth within 31 days and did not meet the requirements for adding her to the policy later as their child. The Roes do not contest this argument. Rather, they only argue that the Celtic Policy covered Brenda Roe up until 31 days after her birth.

Finally, although the Roes eventually adopted Brenda Roe, Celtic correctly points out that neither of the Celtic Policy's provisions for retroactive coverage of adopted children applies. First, the Celtic Policy provides that "[c]overage shall be retroactive from the moment of birth for a child with respect to whom a decree of adoption by the *insured person* has been entered into within thirty-one days after the date of the child's birth." However, this clause does not apply because the "decree of adoption" in this case was not entered until March 20, 2003, well over a year after Brenda Roe's birth on January 12, 2002. Second, the Celtic Policy provides that "[c]overage shall be provided from the moment of birth if adoption proceedings have been instituted by the *insured person* within thirty-one days after the date of the child's birth and the *insured person* has temporary custody."

(*Id.*) This clause does not apply because although the Roes took custody of Brenda Roe immediately after her birth, the "adoption proceedings" did not begin within 31 days. The "adoption proceedings" did not formally begin until the Roes amended their family court complaint on January 14, 2003, to seek an order of adoption. Even if the "adoption proceedings" began on April 24, 2002, when the Roes filed their original complaint in state court seeking a declaration that they were the legal and natural parents of Brenda Roe, this was more than 31 days after the birth. Thus, the adoption provisions of the Celtic Policy do not provide retroactive coverage after the initial thirty-one day period.

## IV. Conclusion

For the reasons stated above,

It is therefore, **ORDERED** that Mid–South's Motion for Summary Judgment be **GRANTED** and that the Does' Motion for Summary Judgment be **DENIED** as to coverage under the Mid–South Policy for medical care and treatment provided to Brenda Roe.

It is **FURTHER ORDERED** that Mid–South's Motion for Summary Judgment be **DENIED** and that the Does' Motion for Summary Judgment be **GRANTED** as to coverage under the Mid–South Policy for medical care and treatment provided to Jane Doe resulting from complications of her surrogate pregnancy with Brenda Roe.

It is **FURTHER ORDERED** that Mid–South's Motion for Summary Judgment be **GRANTED** and that the Does' Motion For Summary Judgment be **DENIED** as to their counterclaim for bad faith refusal to pay benefits.

It is **FURTHER ORDERED** that Celtic's Motion for Summary Judgment be DENIED and the Roes' Motion for Summary Judgment be **GRANTED** as to coverage for Brenda Roe under the Celtic Policy in the initial thirty-one day period after her birth.

It is **FURTHER ORDERED** that Celtic's Motion for Summary Judgment be **GRANTED** as to coverage for Brenda Roe under the Celtic Policy after the initial thirty-one day period after her birth.

**AND IT IS SO ORDERED.**