# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
April 15, 2005 Session
Heard at Pulaski[1]

## IN RE C.K.G., C.A.G., & C.L.G.

**Appeal by permission from the Court of Appeals, Middle Section
Juvenile Court of Williamson County
No. 38410    Lonnie R. Hoover, Judge**

---

**No. M2003-01320-SC-R11-CV - Filed October 6, 2005**

---

This controversy involves a maternity dispute. An unmarried, heterosexual couple had three children by obtaining eggs donated from an anonymous third-party female, fertilizing the eggs *in vitro* with the man's sperm, and implanting the fertilized eggs in the woman's uterus. The couple intended to rear the children together as father and mother. When the couple's relationship deteriorated, the woman filed a parentage action seeking custody and child support. In response, the man claimed that the woman had no standing as a parent because, lacking genetic connection to the children, she failed to qualify as a parent under Tennessee's parentage statutes. On this basis, the man sought sole and exclusive custody. Employing a broadly-framed test that looks to the parties' pre-conception intent to determine maternity, both the juvenile court and the Court of Appeals held that the woman was the children's legal mother. Alternatively, the Court of Appeals held that the man, based on his representations and conduct which induced detrimental reliance by the woman, is estopped to deny the woman's status as mother. We vacate the adoption of the intent test by the court below and also vacate the holding of the Court of Appeals that the man is estopped to deny the woman's maternal status. However, we affirm on separate grounds the holding of the courts below that the woman is the children's legal mother with all the rights and responsibilities of parenthood. Our holding in this regard is based on the following factors: (1) prior to the children's birth, both the woman as gestator and the man as the genetic father voluntarily demonstrated the bona fide intent that the woman would be the children's legal mother and agreed that she would accept the legal responsibility as well as the legal rights of parenthood; (2) the woman became pregnant, carried to term, and gave birth to the children as her own; and (3) this case does not involve a controversy between a gestator and a female genetic progenitor where the genetic and gestative roles have been separated and distributed among two women, nor does this case involve a controversy between a traditional or gestational surrogate and a genetically-unrelated intended mother. Our holding today is tailored narrowly to the specific

---

[1]Oral argument in this case was heard April 15, 2005 in Pulaski, Giles County, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

controversy now before us. Having concluded that the woman is the children's legal mother, we also affirm in full the judgments of the juvenile court and Court of Appeals concerning comparative fitness, custody, child support, and visitation.

**Tenn. R. App. P. 11; Judgments of the Trial Court and Court of Appeals Vacated in Part; and Affirmed in Part**

FRANK F. DROWOTA, III, C.J., delivered the opinion of the court, in which E. RILEY ANDERSON, JANICE M. HOLDER, and William M. Barker, JJ., joined. ADOLPHO A. BIRCH, JR., filed a dissenting opinion.

Robert L. Jackson and Larry Hayes, Jr., Nashville, Tennessee (on appeal to the Supreme Court), and P. Edward Schell, Franklin, Tennessee (at trial and on appeal to the Court of Appeals), for the appellant, Dr. Charles K. G.

Pamela M. Spicer, Brentwood, Tennessee (on appeal), and W. Allen Barrett, Nashville, Tennessee (at trial), for the appellee, Ms. Cindy C.

**OPINION**

### I. Factual and Procedural Background

Dr. Charles K. G. and Ms. Cindy C.[2] first met in 1993 while working at Vanderbilt University Medical Center in Nashville. Cindy was a nurse practitioner who managed a department through which Charles, then a medical resident, rotated. Charles and Cindy began dating in 1994. After an initial period of closeness, they maintained for several years an unsteady dating relationship which included an extended period of estrangement.

In 1999, Charles and Cindy not only reunited as an unmarried couple but also soon thereafter began discussing having a child together. By this time Cindy was forty-five years old and Charles was also in his mid-forties. Charles had never had children. He had not grown up in Tennessee, and a December 1999 visit to his birthplace influenced him; he wanted to be a father. Even though Cindy had at least two adult children from prior marriages as well as grandchildren, she was amenable to starting a family with Charles. However, given her age, Cindy was concerned about the viability of her ova, or eggs.

Having decided to have a child, Charles and Cindy pursued *in vitro*[3] fertilization through the

_____

[2]In order to protect the anonymity of the children who are subject to dispute in this case, we refer to them by their initials. For the same reason, we replace the parties' surnames with initials.

[3]*In vitro* means "[i]n an artificial environment, referring to a process or reaction occurring therein, as in a test tube or culture media." PDR Medical Dictionary 889 (Marjory Spraycar ed. 1995).

Nashville Fertility Center. On May 2, 2000, they jointly executed several agreements with the Fertility Center. Although Charles and Cindy were unmarried, they did not alter the boilerplate language that the Center frequently used in its agreements describing them as "husband" and "wife." Included among these agreements was a "RECIPIENT CONSENT FOR DONATION OF OOCYTES BY ANONYMOUS DONOR" ("Recipient Consent") which describes the fertilization procedure and its risks, waives the right of Charles and Cindy to know the egg donor's identity, and outlines the responsibilities of the parties to the agreement. The Recipient Consent further provides as follows:

> I, Cindy (wife), understand that the child(ren) conceived by this method will not have my genetic material, but will have that of the oocyte [egg] donor and my husband [sic]. However, regardless of the outcome, I will be the mother of any child(ren) born to me as a result of egg donation and hereby accept all the legal responsibilities required of such a parent.

This document was signed by Cindy as "wife" and by Charles as "husband" and was witnessed and signed by a physician who represented that he had fully explained the procedure to Charles and Cindy and had answered all their questions. However, Charles and Cindy executed no other agreements concerning their intentions as to parentage or surrogacy.

Shortly thereafter, Charles paid the Fertility Center $10,000 for the procedure of having two anonymously donated eggs fertilized with Charles's sperm and inserted in Cindy's uterus. Charles intended for them to conceive only one child (presumably two eggs were used to increase the procedure's odds of success). After fertilization, one of the eggs divided, resulting in the development of three embryos.[4] All three embryos flourished; Cindy had become pregnant with triplets.

During Cindy's pregnancy, Charles began residing consistently at Cindy's home. Due to complications with the pregnancy, Cindy took an early leave from her job. When she was placed on bed rest, Charles maintained the household and cooked for her. On February 21, 2001, Cindy gave birth via caesarian section to three children: C.K.G., C.A.G., and C.L.G. Tennessee Department of Health birth certificates for the children identify Charles as the father and Cindy as the mother.

Although Charles had never promised to marry Cindy, he represented that he desired permanence and stability with her. Further, Cindy understood and expected that they would raise the children together as mother and father. In fact, Cindy even sought assurance from Charles that she would not have to rear them by herself. Cindy stayed home with the triplets on maternity leave until June 2001 when she returned to work four days per week. Having set aside money in

---

[4]We mostly use the general terms "fertilized egg" and "embryo" because fine technical distinctions concerning successive stages of the conception and gestation processes—such as provided by "zygote" and "preembryo"—are of little relevance to this appeal.

anticipation of having a child, Charles took a one-year leave of absence (February 2001 to January 2002) from his position as an emergency room physician. For the first several months after the triplets' birth, Charles and Cindy lived together and shared parenting responsibilities. They each provided financially for the children's needs. Further, for some time they had discussed the need for a larger home, and they purchased a house in Brentwood together as tenants in common with the understanding that they would bear the cost equally. Cindy sold her prior residence, and she, Charles, and the triplets moved into the new house in August 2001.

After hiring a nanny, Charles and Cindy's relationship soon deteriorated. Cindy alleged that Charles began cultivating or renewing relationships with several other women; Charles admitted to having sex with another woman during a December 2001 trip to London, England. Cindy further alleged that once their relationship had begun to deteriorate, Charles not only became dramatically less involved with the children, but also began withholding financial support from them. In April 2002, after utility service to their home had been cut off, Cindy filed a petition in the juvenile court of Williamson County to establish parentage and to obtain custody and child support.

In response, Charles argued that because Cindy lacks genetic connection to the children, she fails to qualify as the children's "mother" under Tennessee's domestic relations statutes. Contending that Cindy thus lacks standing as a parent, Charles sought sole and exclusive custody of the triplets. Charles further denied that he had failed to support the children financially and also alleged that Cindy was often absent from home on account of her part-time pursuit of a master's degree in business administration. Cindy conceded that Charles increased his involvement with the children after she filed suit. A pendente lite order required Charles to pay Cindy $3,000 per month for child support. Charles and Cindy continued to live together pending trial.

In anticipation of trial, Charles and Cindy stipulated that: (1) eggs donated by an anonymous third-party female were fertilized with Charles's sperm and implanted in Cindy's uterus; (2) Cindy carried the resulting embryos to term and gave birth to triplets; (3) based on genetic testing, Charles is the biological father of all three children; (4) based on genetic testing, none of the children obtained genetic material from Cindy; and (5) the genetic testing was valid.

After a bench trial, the juvenile court ruled that Cindy had standing to bring a parentage action "as legal mother of these three (3) minor children with all the rights, privileges, and obligations as if she were their biological mother." The juvenile court reasoned that Cindy "is the birth mother and always had the intent to birth these children for herself and [Charles]." Having so decided, the juvenile court addressed the question of custody and support. The court concluded that in light of all the circumstances, Charles and Cindy were both good and caring parents. Based upon their "comparative fitness . . . as that affects the best interests of the minor children," the court awarded joint custody with Cindy designated as the primary custodial parent. The court further ordered certain visitation rights in favor of Charles and required him to continue to pay Cindy child support in the amount of $3,000 per month. Charles appealed as of right.

The Court of Appeals affirmed the judgments of the juvenile court. Concerning the question

of Cindy's parental status, the Court of Appeals held not only that Tennessee's paternity and adoption statutes do not control this case, but also that Tennessee case law provides no directly controlling precedent. Consequently, the intermediate court looked to case law from other jurisdictions for guidance. To determine as a matter of law whether Cindy is the "mother" of the triplets, the Court of Appeals adopted the intent test of Johnson v. Calvert, 851 P.2d 776 (Cal. 1993), holding that "this issue should be resolved by looking to the intent of the parties" and not merely to genetics. The intermediate court determined that such an approach is consistent with this Court's decision in Davis v. Davis, 842 S.W.2d 588 (Tenn. 1992), where we emphasized the importance of agreements between parties who choose to take advantage of modern techniques for assisted reproduction. Finding that Cindy was the intended mother and that no other party claimed maternal status, the Court of Appeals held that Cindy is legally the children's mother. Alternatively, based on principles of equity, the Court of Appeals held that Charles is estopped from challenging Cindy's parental status. Having affirmed that Cindy enjoys parental status, the Court of Appeals also affirmed in all respects the juvenile court's judgments concerning comparative fitness, custody, visitation, and child support.

We granted Charles's application for permission to appeal.


## II. Analysis

In this case, an unmarried, heterosexual couple—Charles and Cindy—had children by obtaining eggs donated from an anonymous third-party female, fertilizing the eggs *in vitro* with Charles's sperm, and implanting the fertilized eggs in Cindy's uterus. Even though Cindy had no genetic connection to the three children to whom she eventually gave birth, she and Charles intended to rear the children together as mother and father. When the couple's relationship deteriorated, Cindy filed a parentage action seeking custody and child support from Charles. In response, Charles claimed that Cindy had no standing as a parent because, lacking genetic connection to the children, she failed to qualify as a parent under Tennessee parentage statutes. On this basis, Charles sought sole and exclusive custody. The facts of this case thus present us with a question of first impression in Tennessee: under such circumstances, who as a matter of law is the children's mother? We also must decide secondary questions pertaining to comparative fitness, custody, visitation, and child support.

It is helpful to explain further how the primary issue which we must decide is distinct from other kinds of maternity disputes. This case is distinguishable from maternity disputes within the context of "traditional surrogacy," such as the situation involved in In re Baby M, 537 A.2d 1227 (N.J. 1988), *superseded by statute as recognized in* In re Adoption of Children by G.P.B., 736 A.2d 1277 (N.J. 1999). In a traditional surrogacy arrangement, a surrogate "mother" gives birth to a child by allowing her own eggs to be inseminated. A traditional surrogate mother thus has a genetic connection to the child whom she nonetheless bears on behalf of others. In contrast, "gestational surrogacy" involves *in vitro* fertilization of an intended "mother's" egg which is then implanted for gestation purposes in a genetically-unrelated surrogate "mother." See Ardis L. Campbell, Annotation, Determination of Status as Legal or Natural Parents in Contested Surrogacy Births, 77

A.L.R.5th 567, 574, § 2[a] (2000) (contrasting traditional surrogacy with gestational surrogacy); Kermit Roosevelt III, The Newest Property: Reproductive Technologies and the Concept of Parenthood, 39 Santa Clara L. Rev. 79, 113 (1998) (same); see also Jaycee B. v. Superior Court, 49 Cal. Rptr. 2d. 694, 695 (Cal. Ct. App. 1996) (defining gestational surrogacy).

Our case is closer in kind to "gestational surrogacy with egg donation" where a woman carries and gives birth to a child as a result of fertilization and implantation of a third-party donor's egg. See Campbell, 77 A.L.R.5th at 574, § 2[a]. Under such circumstances, both the egg donor and the gestational carrier, or gestator, may perform the role of surrogate. A "surrogate" is generally defined as "a person appointed to act in place of another . . . ." Webster's Third New Int'l Dictionary of the English Language Unabridged 2302 (Philip Babcock Gove ed. 1971). The egg donor is a surrogate insofar as she provides eggs in place of and on behalf of another woman who cannot produce viable eggs. The gestator may also play the role of surrogate by carrying the child to term in place of and on behalf of another.

In this case, however, an anonymous, surrogate egg donor provided eggs to a gestator (Cindy) who gave birth ostensibly for her own benefit. Whether Cindy may be classified as a gestational "surrogate" is thus problematic, for the question is unavoidably tied up with disputed legal questions. Cindy would argue that she is not a gestational "surrogate" because she gestated and gave birth to the children on behalf of both Charles as father and herself as mother. However, Charles contends that Cindy was merely a gestational "surrogate" on behalf of Charles as the sole legal parent.

## A. The Question of Maternity

In addressing the question of maternity, we review findings of fact by the trial court de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. See Tenn. R. App. P. 13(d); Union Carbide Corp. v. Huddleston, 854 S.W.2d 87, 91 (Tenn. 1993). Our standard of appellate review for questions of law is de novo with no presumption of correctness. Presley v. Bennett, 860 S.W.2d 857, 859–60 (Tenn. 1993).

## 1. The Impact of Modern Reproductive Technology
## on the Legal Definition of Parenthood

"Historically, gestation proved genetic parentage beyond doubt, so it was unnecessary to distinguish between gestational and genetic mothers." Roosevelt, 39 Santa Clara L. Rev. at 97. However, recent developments in reproductive technology have caused a tectonic shift in the realities which underlie our legal conceptions of parenthood.

> With the technological development of a number of processes of procreation, most notably in vitro fertilization, the conceptive and gestational phases of reproduction can now be separate. Thus, the genetic and gestational mothers of a child are no longer necessarily the same person, which can result in a child having several possible parents. These new reproductive technologies and arrangements give rise to the fundamental question of who should be recognized as the parents of

a child born as a result of various parties making distinct contributions to the process of procreation.

Campbell, 77 A.L.R.5th at 574, § 2[a].

This technological fragmentation of the procreative process, insofar as it includes techniques for egg and sperm donation and preservation, has engendered a bewildering variety of possibilities which are not easily reconciled with our traditional definitions of "mother," "father," and "parent."

We now live in an era where a child may have as many as five different "parents." These include a sperm donor, an egg donor, a surrogate or gestational host, and two nonbiologically related individuals who intend to raise the child. Indeed, the process of procreation itself has become so fragmented by the variety and combinations of collaborative-reproductive methods that there are a total of sixteen different reproductive combinations, in addition to traditional conception and childbirth.

John Lawrence Hill, What Does It Mean to Be a "Parent"?  The Claims of Biology as the Basis for Parental Rights, 66 N.Y.U. L. Rev. 353, 355 (1991).  The degree to which current statutory law governs or fails to govern these realities provides the initial framework for our analysis.

## 2.  The Limited Scope of Tennessee's Parentage Statutes

Parentage is an area of law governed primarily by statute.  Unfortunately, Tennessee's parentage and related statutes do not contemplate many of the scenarios now made possible by recent developments in reproductive technology.  We now review Tennessee's statutory scheme.  When construing statutes, we must "ascertain and carry out the legislature's intent without unduly restricting or expanding a statute's coverage beyond its intended scope."  Premium Fin. Corp. of Am. v. Crump Ins. Servs. of Memphis, Inc., 978 S.W.2d 91, 93 (Tenn. 1998).  "In ascertaining the intent of the legislature, this Court may look to 'the language of the statute, its subject matter, the object and reach of the statute, the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment.'"  State v. Gilliland, 22 S.W.3d 266, 275 (Tenn. 2000) (quoting State v. Lewis, 958 S.W.2d 736, 739 (Tenn. 1997)).

The Tennessee Code provides a single cause of action for establishing parentage. Tenn. Code Ann. § 36-2-301 (2001).  A court "may enter an order of parentage upon the agreement of the mother and father unless the court on its own motion orders genetic testing."  Tenn. Code Ann. § 36-2-305(a) (2001).  Alternatively, a complaint to establish parentage of a child may be brought by the child, the "child's mother," a "man claiming to be the child's father," or the Tennessee Department of Human Services.  Tenn. Code Ann. § 36-2-305(b)(1).

The parentage statutes define "mother" as "the *biological* mother of a child born out of wedlock." Tenn. Code Ann. § 36-2-302(4) (2001) (emphasis added).  Similarly, "parent" is defined as "the *biological* mother or *biological* father of a child, regardless of the marital status of the mother

-7-

and father." Tenn. Code Ann. § 36-2-302(5) (emphasis added). The parentage statutes do not define "biological mother." Consequently, we adduce definitions provided by Tennessee's adoption statutes. Statutes *in pari materia*—that is, statutes relating to the same subject or having a common purpose—are to be construed together. Lyons v. Rasar, 872 S.W.2d 895, 897 (Tenn. 1994).

The adoption statutes define "biological parents" as "the woman and man who *physically or genetically conceived* the child." Tenn. Code Ann. § 36-1-102(10) (2001) (emphasis added). Code section 36-1-102(10) focuses solely on conception, making no reference to giving birth. The verb "conceived" is modified by two disjunctively related adverbs. On the one hand, "physically" is an adverb meaning "in a physical manner" and "in respect to the body," Webster's Third New Int'l Dictionary of the English Language Unabridged 1707, and which thus means in a manner which relates to or stands "in accordance with the laws of nature," id. at 1706 (defining "physical"). As used in the statute, "physically . . . conceived" therefore means having caused conception through natural means (coitus) as opposed to artificial means.

On the other hand, "genetically conceived" means having caused conception in a manner pertaining to "genetic makeup and phenomena ." Id. at 946 (defining "genetics"). Genetic conception thus entails the contribution of one's genes[5] to a child. By providing for genetic conception in addition to physical or natural conception, Code section 36-1-102(10) implicitly accounts for genetic procreation via technological assistance. If practicable, a statute is to be construed so that its component parts are reasonably consistent. Marsh v. Henderson, 424 S.W.2d 193, 196 (Tenn. 1968). "Every word used is presumed to have meaning and purpose, and should be given full effect if so doing does not violate the obvious intention of the Legislature." Id.

We agree with the Court of Appeals that Cindy falls outside the statutory scope of the parentage and adoption statutes, which do not expressly control the circumstances of this case. It is appropriate to construe the parentage and adoption statutes narrowly insofar as this case involves such fundamental constitutional rights as parenthood and the right to procreate. See Hawk v. Hawk, 855 S.W.2d 573, 578–79 (Tenn. 1993); Davis v. Davis, 842 S.W.2d 588, 600–01 (Tenn. 1992). Further, we refrain from "speculating about the significance of provisions which are not included in [a] statute," finding it more effective to "consider the words actually used." Fletcher v. State, 951 S.W.2d 378, 382 (Tenn. 1997).

First, although the definition of "biological parents" in Tennessee Code Annotated section 36-1-102(10) implicitly accounts for assisted conception by distinguishing between physical (natural) and genetic conception, see supra, the adoption and parentage statutes do not further elaborate upon this distinction.

Second, even the definition of "surrogate birth" in Tennessee Code Annotated section 36-1-

---

[5]See PDR Medical Dictionary 711 (defining "gene" as "[a] functional unit of heredity which occupies a specific place . . . on a chromosome, is capable of reproducing itself exactly at each cell division, and directs the formation of an enzyme or other protein").

102(48)(A) (2001) assumes the existence of a marital relationship between the intended parents on whose behalf the surrogate carries a child. See Tenn. Code Ann. § 36-1-102(48)(A)(i) ("The union of the *wife's* egg and the *husband's* sperm which are then placed in another woman who carries the fetus to term and who, pursuant to a contract, then relinquishes all parental rights . . . .") (emphasis added); § 36-1-102(48)(A)(ii) (The gestational surrogate "shall relinquish the child to the biological father and the biological father's *wife*.") (emphasis added). As the Court of Appeals correctly pointed out, this definition of surrogate birth is "expressly based on the predicate that the surrogate entered into a contract by which she relinquished all parental rights." Moreover, this statutory definition assumes that the intended mother is a woman other than the gestator. However, in this case not only was there no marriage or surrogacy contract, there is also no evidence in the record to suggest that Cindy gave birth on behalf of anyone but Charles and herself.[6]

Third, the parentage statutes generally fail to contemplate dispute over maternity. For example, the rebuttable presumptions of parentage provided in Tennessee Code Annotated section 36-2-304 (2001) focus exclusively on establishing paternity. See Tenn. Code Ann. § 36-2-304(a) ("A *man* is rebuttably presumed to be the *father* of a child if . . . .") (emphasis added). The statutes also employ the term "mother" in a way that assumes we already know who the "mother" is, see, e.g. Tenn. Code Ann. §§ 36-2-303, 36-2-305(b)(1)(B) (2001), whereas references to "father" include such phrases as "a man claiming to be the child's father," Tenn. Code Ann. § 36-2-305(b)(1)(C), "alleged father," Tenn. Code Ann. § 36-2-305(b)(4), and "putative father," Tenn. Code Ann. § 36-2-318 (2001). Similarly, the statute providing for an order of parentage is concerned solely with the establishment of paternity. See Tenn. Code Ann. § 36-2-311(a) (2001) ("Upon establishing parentage, the court shall make an order declaring the *father* of the child.") (emphasis added). The statutes lack corresponding language concerning the establishment of maternity.

The legislative history of the parentage statutes reinforces our conclusion that they fail to contemplate or to control the circumstances of this case. Where the plain language of a statute does not clearly resolve an issue, it is appropriate to consider the history and purpose of legislation in order to ascertain legislative intent. See Lavin v. Jordon, 16 S.W.3d 362, 365–66 (Tenn. 2000).

In 1997, the Tennessee General Assembly completely overhauled the statutes concerning paternity and legitimation. See 1997 Tenn. Pub. Acts ch. 477. The primary purpose of this change was to streamline and to simplify the formerly separate causes of action for paternity and legitimation by combining them into a single parentage action. See Tenn. Code Ann. §§ 36-2-101 to -115 (1996) (paternity) and §§ 36-2-201 to -210 (1996) (legitimation), *repealed by* 1997 Tenn. Pub. Acts ch. 477 (codified at Tenn. Code Ann. §§ 36-2-301 to -322 (2001)); Tape H-C & FA #1 (Tennessee House of Representatives Children and Family Affairs Committee Mar. 26, 1997) ("This bill is an effort to try to revise our statutes and bring us into the twentieth century and develop *one*

---

[6]We note that the surrogate birth statute itself reflects a neutral legislative stance as to the validity and enforceability of surrogacy arrangements. See Tenn. Code Ann. § 36-1-102(48)(C) ("Nothing herein shall be construed to expressly authorize the surrogate birth process in Tennessee unless otherwise approved by the courts or the general assembly."). We express no opinion here on that issue.

*system* for determining and establishing the parentage of children born out of wedlock.") (statement of Rep. Kim McMillan). The 1997 legislation was also designed to correct a particular constitutional infirmity of the prior statutes.[7]

Significantly, the legislative history shows that the current parentage statutes were not designed to control questions of parentage where sperm or egg donation is involved. In response to the observation that the new parentage statutes could potentially allow a sperm donor to file a parentage claim, Mr. Steve Cobb stated as follows:

> I can tell you that the clear intention, discussed intention, of this [bill] was *not* to deal with sperm donors at all. . . . [W]e wanted to put that off for another day. . . . The intent, and it should be stated by the sponsor in a colloquy on the floor if necessary, is not to affect that issue *at all*.

Tape S-Jud. #4 (Tennessee Senate Judiciary Committee May 13, 1997). Concerning the question of maternity where egg donation is involved, the legislative history contains no indication that this matter was ever contemplated as a potential issue.

In sum, we conclude that Tennessee's parentage and related statutes do not provide for or control the circumstances of this case. Contrary to the position taken by the dissent which would restrict the basis for legal maternity to genetic consanguinity alone, we determine that these statutes simply do not apply to all conceivable parentage determinations. In this regard, we agree with the Court of Appeals.

### 3. Tests for Legal Maternity in Other Jurisdictions

In the absence of express guidance from the legislature, the Court of Appeals looked to case law from other jurisdictions to resolve the dispute of maternity in this case. Among the few jurisdictions which have addressed cases like this one, where a gestational carrier implanted with donated eggs seeks parental status of the resulting children and where legislation does not clearly resolve the matter, two tests for maternity have arisen. Some courts have focused on intent, holding that under such circumstances the intended "mother" is to be deemed the legal mother. See, e.g., Johnson v. Calvert, 851 P.2d 776 (Cal. 1993); In re Marriage of Buzzanca, 72 Cal. Rptr. 2d 280 (Cal. Ct. App. 1998); McDonald v. McDonald, 608 N.Y.S.2d 477 (N.Y. App. Div. 1994). Other courts have instead focused on genetics and gestation, holding that genetic connection to the children is of paramount importance in determining legal maternity. See, e.g., Culliton v. Beth Israel Deaconess Med. Ctr., 756 N.E.2d 1133 (Mass. 2001); Belsito v. Clark, 644 N.E.2d 760 (Ohio Ct. Common

---

[7]Tennessee Code Annotated section 36-2-202(c) (1996), *repealed by* 1997 Tenn. Pub. Acts ch. 477, had provided that "[n]othing herein shall be construed to authorize a putative father to legitimate a child or to execute any voluntary acknowledgment of paternity *without the consent of the mother of such child*" (emphasis added). In 1996, the Tennessee Court of Appeals held that requiring consent of the mother was constitutionally invalid. In re Hood, 930 S.W.2d 575, 580 (Tenn. Ct. App. 1996) ("[W]e hold unconstitutional that part of T.C.A. § 36-2-202(c) which purports to disallow a putative father from attempting to legitimate his child without the mother's consent, on both due process and equal protection grounds.").

Pleas 1994).

The intent test has developed primarily in California. In <u>Johnson</u>, a married couple was unable to have children naturally because the wife had undergone a hysterectomy, yet the wife could still produce eggs. 851 P.2d at 778. The couple entered into a surrogacy agreement with a third-party female who agreed to give birth to a child on their behalf in exchange for $10,000 and other consideration. One of the wife's eggs was fertilized with her husband's sperm and was successfully implanted in the surrogate's uterus. However, when the relationship between the couple and the surrogate deteriorated, litigation over maternity and custody ensued. <u>Id.</u> Under California's version of the Uniform Parentage Act, both genetic consanguinity and giving birth were equally cognizable bases for establishing maternity. <u>Id.</u> at 780–81. The Court declined to recognize two legal mothers. <u>Id.</u> at 781 n. 8. In order to break the tie, the California Supreme Court held that when gestation and genetic consanguinity "do not coincide in one woman, she who intended to procreate the child—that is, she who intended to bring about the birth of the child that she intended to raise as her own—is the natural mother under California law." <u>Id.</u> at 782.[8] The <u>Johnson</u> Court justified its holding in part by strongly affirming the validity of surrogacy contracts. <u>Id.</u> at 784.

The genetic test has been set forth most thoroughly by the Ohio Court of Common Pleas in <u>Belsito</u>. In <u>Belsito</u>, a married couple wanted children, and the wife could produce eggs but could not sustain a pregnancy. 644 N.E.2d at 760–61. By agreement, one of the wife's eggs was fertilized with the husband's sperm and then implanted in the uterus of a gestational surrogate (the wife's sister). Without objection from the surrogate, the couple sought a declaratory judgment of maternity and paternity. <u>Id.</u> at 761–62. Like California, Ohio had adopted a version of the Uniform Parentage Act which provided that "maternity can be established by identifying the natural mother through the birth process or by other means, including DNA blood tests," as provided by statute. <u>Id.</u> at 763 (citing Ohio Rev. Code Ann. ch. 3111). Also declining to recognize two legal mothers, <u>id.</u>, the court applied a two-stage analysis for establishing maternity. First, if the male and female genetic providers have not waived parental rights, they must be declared the legal parents. Second, if the female genetic provider has waived her parental rights, then the gestator is the legal mother. <u>See id.</u> at 767. On this basis, the court held that the married couple, as the child's genetic progenitors, were the legal parents. <u>Id.</u> at 767.

Significantly, Tennessee's statutory framework for establishing maternity differs markedly from the California and Ohio statutes under consideration in <u>Johnson</u> and <u>Belsito</u>. <u>Compare</u> Tenn. Code Ann. § 36-2-302(4) (defining "mother" as "the biological mother of a child born out of wedlock") <u>and</u> Tenn. Code Ann. § 36-1-102(10) (defining "biological parents" as "the woman and man who physically or genetically conceived the child") <u>with</u> Cal. Civ. Code § 7003(1) (West 1983) ("The parent and child relationship may be established . . . [b]etween a child and the natural mother . . . by proof of her having given birth to the child, or under this part."), *repealed by* 1992 Cal. Stat. c. 162 (A.B. 2650), § 4 <u>and</u> Ohio Rev. Code Ann. § 3111.02 (West 1992) ("The parent and child relationship between a child and the child's natural mother may be established by proof of her having

---

[8]The intent test of <u>Johnson</u> was adopted with little analysis in <u>McDonald</u>, 608 N.Y.S.2d at 480.

given birth to the child or pursuant to [other sections of the Ohio Revised Code].”). Consequently, neither California's intent test nor Ohio's genetic test is strictly apposite to our statutory scheme.

Further, both the intent test and the genetic test suffer from inadequacies. For example, in Johnson the California Supreme Court crafted an unnecessarily broad rule which could afford maternal status even to a woman who failed to qualify under either of California's two statutory bases for maternity. See Johnson, 851 P.2d at 783. According to Belsito, the intent formulation of Johnson has "discarded both genetics and birth as the primary means of identifying the natural maternal parent," Belsito, 644 N.E.2d at 764, and provides for, "in effect, a private adoption process that is readily subject to all the defects and pressures of such a process," id. at 766. In Tennessee, unlicensed and unregulated adoption is statutorily prohibited and subject to criminal penalties. See Tenn. Code Ann. §§ 36-1-108 to -109 (2001).

However, the genetic test of Belsito also has significantly broad implications. In the event that a dispute were to arise between an intended mother who had obtained eggs from a third-party donor and a gestational surrogate in whom the eggs had been implanted, the genetic test would implicitly invalidate any surrogacy agreement. The genetic test could also have practical effects similar to the "adoption-default model" criticized by In re Marriage of Buzzanca, see 72 Cal. Rptr. 2d at 289, in that an intended "mother" who employs techniques for assisted reproduction including egg donation would by default have to submit to government-controlled adoption procedures to attain a secure legal status as "mother." Policy-wise, the requirement of such regulation may or may not be sound.

Consequently, we decline to adopt either the intent test or the genetic test as a general rule for resolving this case. We thus vacate the adoption of the intent test of Johnson by the courts below.

### 4. Factors for Establishing Legal Maternity

In light of the foregoing analysis, we deem it appropriate to decide this case on particularly narrow grounds. In Davis the primary issue hinged on the constitutional right to avoid procreation, see 842 S.W.2d at 601–02, but in the instant case the issue surrounds the maternity and custody of children who have already been born as the result of techniques for assisted reproduction and egg donation. Children, of course, are not property, and the State's interest in the welfare of children is eminently greater than the State's interest in controlling preembryos. The distinction between Davis and this case thus highlights the complexities involved in determining whether the affirmative attempt to procreate via technological assistance including egg or sperm donation is more closely analogous to procreative autonomy with its corresponding right of privacy or more closely analogous to a private form of adoption and thus more susceptible to governmental regulation in the interest of child welfare. Such a determination—which strikes at the very roots of current social values—is inherently policy-laden and both administratively and fiscally momentous, and its resolution on a broad scale is properly reserved for the legislature.

Therefore, in resolving this case we focus closely on its particular facts. Charles and Cindy,

an unmarried couple, wanted to start a family and agreed to rear a child together permanently as father and mother, not suspecting that their own relationship would eventually fall apart. Given Cindy's age, they agreed to fertilize anonymously donated eggs with Charles's sperm and to implant the fertilized eggs in Cindy's uterus. Before the procedure, Charles and Cindy executed the Recipient Consent in which Charles acknowledged Cindy's status as "mother" and in which Cindy agreed to accept all the responsibilities of parenthood:

> I, Cindy (wife), understand that the child(ren) conceived by this method will not have my genetic material, but will have that of the oocyte [egg] donor and my husband [sic]. However, regardless of the outcome, I will be the mother of any child(ren) born to me as a result of egg donation and hereby accept all the legal responsibilities required of such a parent.

Cindy was impregnated and carried not just one but three fetuses to term. After a complicated pregnancy, she gave birth via caesarian section to triplets. Charles allowed Cindy to be named the "mother" on the children's birth certificates. After the children were born, Charles and Cindy lived together in an arrangement where both Charles and Cindy performed the role of parent.

Having recounted these events, we now discuss the relevant factors which we consider to be significant for deciding this case.

### i. Genetics

Both statute and sound policy support genetics as an important factor in establishing legal maternity. Human reproduction as we now know it cannot take place without the involvement of genetic material. As analyzed above, Tennessee's domestic relations statutes provide for the establishment of legal maternity based on genetic consanguinity. See §§ 36-2-302(4) (defining "mother" as "the biological mother of a child born out of wedlock"), 36-1-102(10) (defining "biological parents" as "the woman and man who physically or genetically conceived the child"). In emphasizing genetics, Belsito recognizes and honors an individual's decision to procreate or to refrain from procreating. 644 N.E.2d at 766 ("The procreation of a child, that is, the replication of the unique genes of an individual, should occur only with the consent of that individual." (citing Davis, 842 S.W.2d at 588)). As we held in Davis, such decisions enjoy constitutional protection. 842 S.W.2d at 600–01.

However, our recognition in Davis of the constitutional right to control the disposition of one's genetic material does not mean that Davis stands for the proposition that genetics must be paramount in all parentage determinations. In cases such as this one, where a woman has become intimately involved in the procreation process even though she has not contributed genetic material, factors other than genetics take on special significance.

### ii. Intent

Before the children's birth, both Cindy and the genetic father, Charles, voluntarily demonstrated the bona fide intent that Cindy would be the children's legal mother, and they agreed

that Cindy would accept all the legal responsibility as well as the legal rights of parenthood. We consider the intent to take on both parental rights and responsibilities as one important factor among others for resolving this controversy.

Although our decision in <u>Davis</u> does not control this case, we agree with the Court of Appeals that it is nonetheless instructive. In <u>Davis</u>, this Court had to decide whether a man could prevent donation and implantation against his will of a preembryo (an early-stage fertilized egg) containing his genes. 842 S.W.2d at 589–90. We held that just as an individual enjoys a constitutionally-protected right to procreate, an individual also has a similar right to avoid procreation. <u>Id.</u> at 600-01. We concluded that disputes over the control of preembryos are to be resolved first by looking to the agreement of the progenitors and second, in the absence of agreement, by weighing the relative interests of the male and female providers of reproductive cells. <u>Id.</u> at 604. <u>Davis</u> thus underscored the importance of intent and agreement with respect to the disposition of an individual's reproductive and genetic material.

Although Tennessee's parentage statutes recognize maternity on the basis of genetics, <u>see</u> Tenn. Code Ann. §§ 36-1-102(10), 36-2-302(4), as we have seen that the parentage statutes do not expressly control this case and thus do not necessarily confine the establishment of legal maternity to genetics alone. To the contrary, we determine that taking intent into consideration as a factor is consistent with policy implicit in Tennessee's domestic relations statutes.

Significantly, the artificial insemination statute of Tennessee Code Annotated section 68-3-306 (2001) supports the consideration of intent as a factor for establishing legal maternity. This section is entitled "Birth from artificial insemination" and is contained in the part of the Tennessee Code which addresses vital records. It provides as follows: "A child born to a married woman as a result of artificial insemination, with consent of such married woman's husband, is deemed to be the legitimate child of the husband and wife." Tenn. Code Ann. § 68-3-306. Like the parentage statutes, Code section 68-3-306 does not expressly govern this case because the statute contemplates and provides for an agreement within the context of marriage; Charles and Cindy were not married, and in any event there is now a lack of consent. Notwithstanding, it is significant that Code section 68-3-306 confers parental status on a husband even though the child conceived in his wife via artificial insemination is not necessarily genetically related to him. The artificial insemination statute thus reflects a policy which favors taking into account intent in establishing parentage when technological assistance is involved.

### iii. Gestation

Cindy became pregnant and gave birth to the children with the intent of raising them as her own. As mentioned above, historically gestation "proved genetic parentage beyond doubt" and thus was conclusive of maternity. <u>See</u> Roosevelt, 39 Santa Clara L. Rev. at 97; <u>see also</u> Malina Coleman, <u>Gestation, Intent, and the Seed: Defining Motherhood in the Era of Assisted Human Reproduction</u> 17 Cardozo L. Rev. 497, 501 (1996) ("When the two functions of genetic contribution and gestation were inextricably bound, the issue of legal motherhood at birth was not disputable. The ancient maxim, *mater est quam gestation demonstrat* (by gestation the mother is demonstrated),

unqualifiedly applied to all births."). The common law thus has presumed that the birth mother is the legal mother of the child. See Coleman, 17 Cardozo L. Rev. at 524. It is only quite recently that modern technology has made it possible to separate and to distribute among multiple persons or environments the genetic and gestational roles. We consider gestation as another important factor in determining legal maternity in this case.

To be sure, as discussed above, genetics remains an irreplaceable component of human reproduction, and as such genetic consanguinity is and should be particularly important to parentage determinations. And as our analysis above has shown, Tennessee's domestic relations statutes expressly account for genetics in parentage determinations. See Tenn. Code Ann. §§ 36-1-102(10), § 36-2-302(4).

However, as our analysis above has also shown, Tennessee's parentage and related statutes were simply not designed to control the circumstances of this case. To restrict legal maternity to genetic consanguinity alone where, as in this case, the genetic "mother" is an egg donor who has waived her parental rights and who has been and remains permanently anonymous would result in the absurdity of children having, for all practical purposes, no legal mother. A child's knowledge that he or she has an anonymous and inaccessible mother somewhere in the world would provide only cold comfort, and demanding such a result in cases like this one could hardly promote the best interests of children. "Courts must presume that the Legislature did not intend an absurdity and adopt, if possible, a reasonable construction which provides for a harmonious operation of the laws." Fletcher, 951 S.W.2d at 382 (citing Cronin v. Howe, 906 S.W.2d 910, 912 (Tenn. 1995) and Epstein v. State, 366 S.W.2d 914 (Tenn. 1963)).

We further observe that in this case the genetic "mother" has donated her eggs to another and has correspondingly waived her parental rights, thereby relinquishing her status as legal mother. As Belsito correctly concludes, "a genetic test cannot be the only basis for determining who will assume the status of legal parent." 644 N.E.2d at 767.

Although giving birth is conspicuously absent from Tennessee's parentage statutes, as discussed above, there is no indication that the General Assembly sought to exclude it as a basis for legal maternity or even sought to decide questions of maternity at all. In this regard, the artificial insemination statute is once again significant. In addition to recognizing paternity where artificial insemination is involved, Tennessee Code Annotated section 68-3-306 confers parental status on a wife when she gives birth to a child as the result of artificial insemination. This statute displays a policy which favors recognizing gestation and giving birth as a basis for legal maternity.

Accordingly, we conclude that sound policy and common sense favor recognizing gestation as an important factor for establishing legal maternity. "Although current technology allows the separation between gestation and genetic contribution, it does not follow that gestation is now a less important part of parenthood." Coleman, 17 Cardozo L. Rev. at 517. In our view, the dissent accords too little significance to gestation as a factor for deciding this controversy.

### iv.  The Absence of Controversy Between
### the Gestator and the Genetic "Mother"

Another factor to consider in resolving this case is the nature of the controversy.  Here we are not faced with a controversy between a birth "mother" and a genetic "mother" where the genetic and gestational roles have been separated and distributed among two women.  In this case, the genetic "mother" has fully waived her parental rights and remains anonymous.  Nor is this a case involving a dispute between a traditional or gestational surrogate and a genetically-unrelated intended "mother" who wishes to raise the child as her own.  Rather, Cindy became pregnant and gave birth to triplets on her own behalf, and the sole dispute is between her and the genetic father, Charles.  The other kinds of conflicts present different questions and ones which would be inappropriate for us to decide here.  Instead, we limit our holding today to cases where there is no controversy between the gestator and the genetic "mother."

### 5.  Establishing Legal Maternity in This Case

Deciding this case narrowly based on its particular facts, we affirm on separate grounds the holding of the courts below that Cindy is the legal mother.  Our holding that Cindy is the legal mother of C.K.G., C.A.G., and C.L.G. with all the legal rights and responsibilities of parenthood is based on the following factors.  First, prior to the children's birth, both Cindy, the gestator, and Charles, the genetic father, voluntarily demonstrated the bona fide intent that Cindy would be the children's legal mother and agreed that Cindy would accept the legal responsibility as well as the legal rights of parenthood.  Second, Cindy then became pregnant, carried to term, and gave birth to the three children as her own.  Third, this case does not involve a controversy between a gestator and a female genetic progenitor where the genetic and gestative roles have been separated and distributed among two women, nor does this case involve a controversy between a traditional or gestational surrogate and a genetically-unrelated intended mother; our holding today is not designed to control such controversies.  Even though Cindy lacks genetic connection to the triplets, in light of all the factors considered we determine that Cindy is the children's legal mother.  We further conclude that in light of the factors considered, Charles's genetic paternity does not give him a parental status superior to that of Cindy.

Having thus concluded that Cindy is the children's legal mother, the question of estoppel is moot, and we vacate the holding of the Court of Appeals that Charles is estopped to deny Cindy's maternal status.

### 6.  The Need for Legislative Action

Given the far-reaching, profoundly complex, and competing public policy considerations necessarily implicated by the present controversy, we conclude that crafting a general rule to adjudicate all controversies so implicated is more appropriately accomplished by the Tennessee

General Assembly.[9]  Cf. Taylor v. Beard, 104 S.W.3d 507, 511 (Tenn. 2003) (declining to create a previously unrecognized common law cause of action where doing so would have "far-reaching social and legal consequences in an area that we have consistently left to legislative discretion"). The General Assembly is better suited than the courts to gather data, to investigate issues not subject to current litigation, and to debate the competing values and the costs involved in such an issue as deciding whether generally to subject procreation via technological assistance to governmental oversight, and if so, to determine what kind of regulation to impose.  Cf. Smith v. Gore, 728 S.W.2d 738, 747 (Tenn. 1987) ("The Court simply does not function as a forum for resolution of . . . generalized public issues; rather, it must decide the legal case or controversy presented by the particular parties before it.").  Even courts which have crafted and applied the intent and genetic tests have been cognizant of the need for legislative action concerning technologically assisted human reproduction.[10]  Although the courts have the power to "determine public policy in the absence of

---

[9]We note that concerning a variety of issues, this Court has invited legislative action or has reserved lawmaking as more appropriate for the legislature.  See, e.g., Pike v. State, 164 S.W.3d 257, 264–65 (Tenn. 2005) (stating that it is up to the legislature to determine whether to mandate post-conviction review of a death sentence); Dotson v. Rice-Chrysler-Plymouth-Dodge, Inc., 160 S.W.3d 495, 503 n.5 (Tenn. 2005) (stating that the Court must "uphold and effectuate the statutory [worker's] compensation scheme as it is provided by the legislature" while acknowledging that doing so could require fully debilitating reflex sympathetic dystrophy to fall under scheduled member recovery); Sullivan ex rel. Hightower v. Edwards Oil Co., 141 S.W.3d 544, 546, 548 (Tenn. 2004) (inviting legislative action concerning compensation of family members who care for injured workers); Taylor v. Beard, 104 S.W.3d 507, 510–11 (Tenn. 2003) (stating that it is for the legislature and not the courts to create a cause of action for loss of parental consortium in personal injury cases); State v. Goodman, 90 S.W.3d 557, 565 (Tenn. 2002) (stating that it is for the legislature and not the courts to amend the criminal statute for especially aggravated kidnapping); Limbaugh v. Coffee Med. Ctr., 59 S.W.3d 73, 83–84 (Tenn. 2001) (refusing to judicially create additional exceptions to the Governmental Tort Liability Act); State v. Godsey, 60 S.W.3d 759, 772 (Tenn. 2001) (stating that it is for the legislature to decide whether to require electronic recording of interrogations by law enforcement officials); Bryant v. Genco Stamping & Mfg. Co., 33 S.W.3d 761, 766 (Tenn. 2000) (stating that it is for the legislature and not the courts to make the policy decision to subject the Second Injury Fund to liability for preexisting mental disability when the plain language of the controlling workers' compensation statute provides otherwise); Gleaves v. Checker Cab Transit Corp., 15 S.W.3d 799, 804 (Tenn. 2000) (holding that the plain language of a metropolitan ordinance subjected a cab company to liability even for off-duty drivers of cabs and stating that it is for the Metropolitan Council and not the courts to restrict the ordinance's scope of liability); State v. Owens, 20 S.W.3d 634, 641 (Tenn. 2000) (holding that violence or threat of violence which occurs after a theft has been completed fails to satisfy the violence element of Tennessee's robbery statute and stating that it is "up to the General Assembly, not this Court, to promulgate the parameters of the offense.").

[10]See Johnson, 851 P.2d at 784–85 ("We are all too aware that the proper forum for resolution of this issue [of the potential evils of surrogacy agreements] is the Legislature, where empirical data, largely lacking from this record, can be studied and rules of general applicability developed.  However, in light of our responsibility to decide this case, we have considered as best we can its possible consequences."); In re Marriage of Buzzanca, 72 Cal. Rptr. 2d at 293 ("[W]e must call on the Legislature to sort out the parental rights and responsibilities of those involved in artificial reproduction. . . . [W]e still believe it is the Legislature, with its ability to formulate general rules based on input from all its constituencies, which is the more desirable forum . . . ."); Culliton, 756 N.E.2d at 1139 ("The Legislature is the most suitable forum to deal with the questions [of the parentage of children born from various methods of reproductive technologies or assisted conception] involved in this case, and other questions as yet unlitigated, by providing a comprehensive set of laws that deal with the medical, legal, and ethical aspects of these practices."); see also Belsito, 644 N.E.2d at 766 (criticizing the intent test of Johnson as the kind of divergence from established law which is better suited for the legislature "through the scrutiny of public hearings and debate.").

any constitutional or statutory declaration," <u>Alcazar v. Hayes</u>, 982 S.W.2d 845, 851 (Tenn. 1998)—indeed, in this case we have crafted a judicial rule, albeit a particularly narrow one which we find to be consistent with policy implicit in the Tennessee Code—for us to declare a policy of sweepingly general and administratively grave effect based on the very narrowly circumscribed data before us in this controversy would cause us to intrude upon the legislative function, <u>see</u> <u>Cavender v. Hewitt</u>, 239 S.W. 767, 768 (Tenn. 1922).[11]

## B. Custody and Child Support

Having determined that Cindy is the children's legal mother, we now review the juvenile court's decisions concerning comparative fitness, custody, visitation, and child support, which the Court of Appeals affirmed. Our standard of review in child custody cases is de novo upon the record of the trial court with a presumption of correctness, unless the evidence preponderates otherwise. <u>See</u> Tenn. R. App. P. 13(d); <u>Hass v. Knighton</u>, 676 S.W.2d 554, 555 (Tenn. 1984).

The paramount consideration in child custody cases is the child's best interests. Tenn. Code Ann. § 36-6-106(a) (2001); <u>Lentz v. Lentz</u>, 717 S.W.2d 876, 877 (Tenn. 1986). In disputes between legal parents,[12] we determine a child's best interests in light of the comparative fitness of the parents, <u>see</u> <u>Parker v. Parker</u>, 986 S.W.2d 557, 562 (Tenn. 1999); <u>Bah v. Bah</u>, 668 S.W.2d 663, 665–66 (Tenn. Ct. App. 1983), and must take into consideration numerous factors insofar as they are applicable, such as the following:

> (1) The love, affection and emotional ties existing between the parents and child;
> (2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;
> (3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment . . .;
> (4) The stability of the family unit of the parents;
> (5) The mental and physical health of the parents;
> (6) The home, school and community record of the child;
> . . . .
> (9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and

---

[11] We note that model legislation exists for determining parentage where assisted reproduction and the donation of sperm or eggs is involved. <u>See, e.g.</u>, Uniform Parentage Act (2000), 9B U.L.A. 295 (2001) (including new provisions covering assisted reproduction); Uniform Status of Children of Assisted Conception Act (1988), 9C U.L.A. 363 (2001). We express no opinion concerning the merits of these model acts.

[12] Custody disputes between a parent and a nonparent involve a different standard under which "a child's welfare must be threatened before the state may intervene in parental decision-making." <u>Hawk v. Hawk</u>, 855 S.W.2d 573, 580 (Tenn. 1993). This standard is inapplicable here because we have determined that Cindy is legally a parent.

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-106(a)(1) to -106(a)(6), -106(a)(9) to -106(a)(10) (2001).

The juvenile court concluded that in light of all the circumstances, Charles and Cindy were both good and caring parents. Based upon their "comparative fitness . . . as that affects the best interests of the minor children," the court awarded joint custody with Cindy designated as the primary custodial parent. The court further ordered certain visitation rights in favor of Charles and required him to continue to pay Cindy child support in the amount of $3,000 per month. Having carefully reviewed the record, we see no reason to alter the juvenile court's determinations in this regard. Therefore, concerning these matters we affirm the judgments of the courts below.

### III. Conclusion

We conclude that Tennessee's parentage statutes neither provide for nor contemplate the circumstances of this case, where an unmarried couple has employed techniques for assisted reproduction involving third-party egg donation to produce children for their own benefit and where dispute has arisen over the genetically unrelated gestator's legal status as mother. Although in some jurisdictions courts have fashioned widely applicable tests for maternity where techniques for assisted reproduction are involved, we decline to adopt as a general rule either the intent test or the genetic test. Consequently, we vacate the adoption of the intent test by the courts below.

Instead we affirm on separate and narrower grounds the holding of the courts below that Cindy is the legal mother of the children C.K.G., C.A.G., and C.L.G. with all the rights and responsibilities of parenthood. Our holding in this regard depends on the following factors: (1) prior to the children's birth, both Cindy as gestator and Charles as the genetic father voluntarily demonstrated the bona fide intent that Cindy would be the children's legal mother and agreed that she would accept the legal responsibility as well as the legal rights of parenthood; (2) Cindy became pregnant, carried to term, and gave birth to the children as her own; and (3) this case does not involve a controversy between a gestator and a female genetic progenitor where the genetic and gestative roles have been separated and distributed among two women, nor does this case involve a controversy between a traditional or gestational surrogate and a genetically-unrelated intended mother. In our view, given the far-reaching, profoundly complex, and competing public policy considerations necessarily implicated by the present controversy, crafting a broadly applicable rule for the establishment of maternity where techniques for assisted human reproduction are involved is more appropriately addressed by the Tennessee General Assembly.

Having concluded that Cindy is the children's legal mother, the question of estoppel is moot, and we vacate the holding of the Court of Appeals that Charles is estopped to deny Cindy's maternal status. However, we affirm in full the judgments of the juvenile court and Court of Appeals

concerning comparative fitness, custody, child support, and visitation. Costs of this appeal are taxed to the appellant, Charles, for which execution may issue if necessary.

_____
FRANK F. DROWOTA, III, CHIEF JUSTICE