**BELSITO et al.**

v.

**CLARK et al.**

Court of Common Pleas of Ohio,
Summit County,
Probate Division.

No. CJ94–09–05.

Decided Nov. 14, 1994.

*Richard E. Dobbins,* for Anthony and Shelly Belsito.

*Kurt R. Weitendorf,* for Carol S. Clark.

*George R. Wertz,* guardian *ad litem,* for the unborn child.

W.F. SPICER, Judge.

## FINDINGS OF FACT

Plaintiffs, Anthony and Shelly Belsito, were married September 26, 1992. They decided they wanted a large family. Unfortunately, approximately one month prior to their marriage, Shelly had to undergo a hysterectomy as a result of recently discovered cervical cancer. Her physician had to remove her uterus, but was able to save her ovaries so that she could continue to produce eggs.

Carol S. Clark is Shelly's younger sister. Around the same time as Shelly's hysterectomy, Carol gave birth to her third child. Carol knew how much having a family meant to Shelly and Tony so, at that time, Carol told Shelly that, if she could, she would carry Shelly and Tony's baby for them.

In October 1993, Shelly and Tony were accepted into the University Hospitals' program for in vitro fertilization, Shelly and Tony as the genetic parents and Carol as the surrogate host. Carol was to receive no compensation for her role as a surrogate for Shelly and Tony's baby. Carol testified that she planned to be no more than an aunt to the child.

Dr. Leon Sheean is the Director of the Laboratories for In Vitro Fertilization and Andrology at University Hospitals of Cleveland, MacDonald Hospital for Women ("MacDonald Hospital"). Since he became the director in January 1990, Dr. Sheean has overseen all in vitro fertilization and andrology procedures in the laboratory, has established the policies in place at the hospital, and has been responsible for maintaining records of the events and patients that are treated within the program.

Dr. Sheean testified as to the policies, procedures, and routines followed at MacDonald Hospital in reference to the in vitro fertilization program. Dr. Sheean testified in great detail as to the procedures involved, and the methods of quality control used to ensure that the fetus is the result of the genetic parents and that it is placed in the proper surrogate, resulting in "one-hundred percent certainty" that the child is the biological and genetic child of the infertile couple.

Pursuant to the policies of the in vitro fertilization program, there are several checks and balances to ensure the propriety of the eggs and the sperm. First, the frequent visits to the hospital during the evaluation and the treatment stages

allow the staff at the lab to establish a conversive relationship with the parties, and to identify them by sight. Second, all the containers used in the process are clearly labeled prior to the cells' being placed into the container. The petri dishes are labeled and color-coded with a color that is unique to that patient.

All the foregoing procedures were followed in the Belsito case. In addition, Shelly, Tony, and Carol signed separate consent forms to participate in the program. Within these documents, the parties consented to their status within the program. The consent form signed by Carol Clark described her as a "carrier." The consent form signed by Shelly and Tony designated them as the "mother" and "father" of the child.

In approximately January 1994, Shelly and Carol began the process of preparing for the procedure. Prior to the planned embryo transfer, Shelly and Carol began taking various medications to align their fertility cycles and prepare their bodies for the procedure. In addition, Carol testified that she abstained from sexual intercourse for at least two months prior to the procedure and at least two weeks after the procedure.

On February 10, 1994, Shelly Belsito was admitted to MacDonald Hospital for the retrieval of the eggs from her ovaries. A total of ten eggs was recovered from Shelly. Tony's sperm was collected in a labeled container, washed, and added to the eggs. On February 12, 1994, Carol Clark was admitted to MacDonald Hospital for transfer of the embryos into her uterus. The two fertilized eggs were transferred into Carol's uterus by her physician. Shelly was also present at the transfer. Approximately two weeks after the transfer, the parties went to the hospital for a pregnancy test. At that time, it was confirmed that one of the two embryos did attach. Carol was carrying Shelly and Tony's child.

According to expert testimony of Dr. Sheean, the fetus placed in the carrier sets up an entirely separate system from the carrier. The uterus provides only a means of nourishment to and a means of carrying waste away from the baby's system. The uterus provides a "filtering system" for the child. Blood between the carrier and the fetus is not exchanged during the pregnancy, absent some complication. According to the opinion of Dr. Sheean, there would be no genetic or blood tie to the surrogate host.

Dr. Sheean expressed his opinion that the unborn child carried by Carol Clark was genetically the child of Anthony and Shelly Belsito, and that Carol Clark as a surrogate would contribute none of the DNA that would ultimately make up the genetics of the unborn child.

The parties knew that the baby was a boy, and planned on naming him Nicholas Anthony Belsito. The original due date for the child was calculated to

be November 14, 1994. However, Carol was scheduled to undergo a Caesarean section on October 12, 1994, at Akron City Hospital. Shelly and Tony planned on being at Nicholas's birth. Shelly was also planning to nurse Nicholas.

In preparing for Nicholas's birth, Shelly spoke with Akron City Hospital regarding the birth certificate. She was told that, according to Ohio law, the woman who gave birth to the child will be listed on the birth certificate as the child's mother. Further, she was told that because Carol, the surrogate, and Tony, the genetic and biological father, are not married, the child will be considered illegitimate, and will be listed on his birth records as "Baby Boy Clark" and not as "Baby Boy Belsito."

As a result of that information, Anthony and Shelly Belsito filed a complaint for declaratory judgment with the court on September 14, 1994. A hearing was held on September 27, 1994. From that declaratory judgment and the hearing, the Belsitos have requested this court to declare that it is unnecessary for them to adopt the child now carried by Carol Clark. They contend that they are the genetic and natural parents of that child and are therefore entitled to be recognized as having the legal status of parents. In addition, they have requested that the court order the preparer of the birth certificate to reflect the legitimate status of the child and the Belsitos' status as the legal and natural parents of the child.

## CONCLUSIONS OF LAW

The central question of the declaratory judgment action before the court is, who is to assume the legal status of natural parents of the unborn child carried by Carol S. Clark?

Under the foregoing findings of fact, the court must conclude that Carol S. Clark is the gestational surrogate, and the genetic makeup of the child she carries has been determined by the egg and the sperm of Shelly Belsito and Anthony Belsito. The court is of the opinion that the law requires that, because Shelly Belsito and Anthony Belsito provided the child with its genetics, they must be designated as the legal and natural parents.

The analysis and law in support of that conclusion begin with the proposition that the law will impose the duties of a child-parent relationship and legal status of natural parents only upon those individuals who can be found to be a natural or adoptive parent. *State v. Barger* (1920), 14 Ohio App. 127, 129; *Angel v. Angel* (C.P.1956), 74 Ohio Law Abs. 531, 533–534, 2 O.O.2d 136, 137, 140 N.E.2d 86, 87. See, also, *Burlington Cty. Welfare v. McClain* (1983), 189 N.J.Super. 152, 458 A.2d 1348; *Brummitt v. Kentucky* (Ky.App.1962), 357 S.W.2d 37.

Since plaintiffs, Anthony Belsito and Shelly Belsito, have alleged that they are the natural parents and not subject to the adoption laws of this state, the analysis of the law must be confined to the question of what constitutes or identifies a "natural parent."

■ While various terms are used to identify a natural parent, a review of case law leads to the conclusion that "natural parent" refers to the child and parent being of the same blood or related by blood. *Owens v. Bell* (1983), 6 Ohio St.3d 46, 48, 6 OBR 65, 67–68, 451 N.E.2d 241, 243; R.C. 2317.47; R.C. 3111.09. Black's Law Dictionary defines "blood relations" as:

"Kindred; consanguinity; family relationship; relation by descent from a common blood ancestor. A person may be said to be 'of the blood' of another who has any, however small a portion, of the blood derived from a common ancestor * * *." Black's Law Dictionary (6 Ed.Rev.1990) 172.

In modern terminology, blood relationship would be described as shared DNA or genetics. Support for the contention that genetic relationship is the modern equivalent of the term "blood relationship" can be found in the evidentiary practice in disputed parentage cases of comparing common biological characteristics. The practice involves the trier of fact's comparing genetic traits of the child and the alleged parent, such as facial features, build, and color of hair and eyes, to confirm or rebut a blood relationship. *Domigan v. Gillette* (1984), 17 Ohio App.3d 228, 17 OBR 494, 479 N.E.2d 291, paragraph two of the syllabus. Further support may be found in the fact that comparison of the blood of both parent and child for a genetic or DNA resemblance has become a recognized means of establishing parentage. See R.C. 3111.09.

Historically and at common law, blood relation was the primary means of establishing the legal status of a natural parent. 1 Blackstone, Commentaries on the Laws of England (7 Ed.1775), Chapter XVI, Of Parent and Child. Under today's laws of parentage, a genetic relationship and blood relationship of the correct degree describe and result in the same legal status or relationship, and proof of either is still the primary means of establishing parentage.

However, in cases involving a maternity dispute, the female who gave birth to a child is considered the natural parent.[1] See *Burlington Cty. Welfare v. McClain* (1983), 189 N.J.Super. 152, 458 A.2d 1348. The rationale behind that rule of substantive law is that for millennia, giving birth was synonymous with providing the genetic makeup of the child that was born. Birth and blood/genetics were one.

---

1. Cases involving disputed maternity are rare compared to paternity disputes; however, they do occur, as evidenced by the Biblical decision of King Solomon. 1 Kings 3:16–28.

■ Blood/genetics and birth, the two ways that the law has historically used to identify the natural parent, are recognized and codified in R.C. Chapter 3111, Ohio's adoption of the Uniform Parentage Act.[2] Under that Act, maternity can be established by identifying the natural mother through the birth process or by other means, including DNA blood tests. R.C. 3111.02.

In most disputed cases, those two ways of identifying natural parents are still valid and reliable. In a small but growing number of cases, however, they can result in confusing and questionable determinations of parentage. The reason for that confusion is modern science and medicine's ability to manipulate the conception and delivery process of a child. By successfully implanting an embryo into the uterus of a female who has become known as the "gestational surrogate" or "surrogate host," modern medicine has devised a way of separating birth from genetics. The introduction of in vitro fertilization means that the female who bears the child may not be the person who provides the genetic imprint for the child's development.

That is the fact pattern of this case. Shelly Belsito has provided the genetics, that is, the egg, which will determine the child's genetics. Shelly's sister, Carol, is the person who will carry and give birth to the child. Under R.C. Chapter 3111, and the cases upon which it is based, both would be considered the mother of the delivered child: Carol, because she gave birth, and Shelly, because she provided the genetic makeup or imprint.

Surrogacy technology did not exist and a separate birth and genetic mother were factually impossible when the statute, case law, and common law were formulated. It must therefore be assumed that the framers of those laws did not intend for the law to result in two mothers. *In re Marriage of Moschetta* (1994), 25 Cal.App.4th 1218, 30 Cal.Rptr.2d 893. This conclusion is buttressed by the fact that the Uniform Parentage Act was intended to address solely the question of legitimacy of a child and not surrogacy. Notes, Uniform Parentage Act. In addition, society and the law recognize only one natural mother and father. *Michael H. v. Gerald D.* (1989), 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91.

It is apparent that the law must adapt and change to end the confusion caused by surrogacy. The question is, how will it adapt? Will the genetic test, or the birth test, or some other means be used to identify those individuals who will be classified as having the legal status of natural mother in cases such as this one in which the surrogate has not provided the genetic imprint for the child?

The fact pattern of this case is one of first impression for Ohio courts, and would be for most jurisdictions in the United States. However, several courts

---

2. In the interest of clarity, the court will refer to the blood relation and the genetic relation simply as "genetics."

have addressed questions involving surrogacy. *In the Matter of Baby M.* (1988), 109 N.J. 396, 537 A.2d 1227; *In re Marriage of Moschetta, supra; Seymour v. Stotski* (1992), 82 Ohio App.3d 87, 611 N.E.2d 454; *Yates v. Keane* (1990), 184 Mich.App. 80, 457 N.W.2d 693, appeal denied (1991), 437 Mich. 986, 470 N.W.2d 372. Two courts have decided cases similar to the case before this court. *Johnson v. Calvert* (1993), 5 Cal.4th 84, 19 Cal.Rptr.2d 494, 851 P.2d 776, certiorari denied (1993), —— U.S. ——, 114 S.Ct. 206, 126 L.Ed.2d 163; *McDonald v. McDonald* (1994), 196 A.D.2d 7, 608 N.Y.S.2d 477.

In *Johnson v. Calvert*, the facts are very similar to this case, with a married couple supplying the egg and sperm and a surrogate agreeing to carry and deliver the child. The difference is that the surrogate in *Johnson* was not related to the genetic providers, and was to be compensated for the surrogacy. A dispute arose over the compensation, and the surrogate claimed to be the parent. The California Supreme Court recognized the genetic providers as the natural parents. That ruling appears to be based on intent of the parties:

"We conclude that although the Act [the Uniform Parentage Act] recognizes both genetic consanguinity and giving birth as a means of establishing a mother and child relationship, when the two means do not coincide in one woman, she who intended to procreate the child—that is, she who intended to bring about the birth of a child that she intended to raise as her own—is the natural mother under California law." *Johnson*, 5 Cal.4th at 94, 19 Cal.Rptr.2d at 500, 851 P.2d at 782. See, also, Hill, What Does It Mean to Be a "Parent"? The Claims of Biology as the Basis for Parental Rights (1991), 66 N.Y.U.L.Rev. 353.

The court in *Johnson* looked for the intent to procreate and to raise the child, in order to identify the natural mother. Since the genetic mother in *Johnson* intended to procreate, she was the natural parent. The *Johnson* court discarded both genetics and birth as the primary means of identifying the natural maternal parent, and replaced both with a test that involves intent of the parties.

In a somewhat similar case, a New York court of appeals determined the gestational surrogate to be the natural mother based on the *Johnson* precedent of intent to procreate. *McDonald v. McDonald* (1994), 196 A.D.2d 7, 608 N.Y.S.2d 477. (In *McDonald*, the gestational surrogate received the egg from an anonymous donor; her husband provided the sperm.) Under the *Johnson* test, either the gestational surrogate or the genetic parents could be recognized as the natural and legal parents, depending on which party intended to procreate and raise the child.

Since both cases emanate from outside the appellate jurisdiction that binds this court, they can only be considered as persuasive and not binding. In light of Ohio law, this court finds neither case to be persuasive, for the following three important reasons: (1) the difficulty in applying the *Johnson* intent test; (2)

public policy; and (3) *Johnson*'s failure to recognize and emphasize the genetic provider's right to consent to procreation and to surrender potential parental rights.

Intent can be difficult to prove. Even when the parties have a written agreement, disagreements as to intent can arise. In addition, in certain fact patterns when intent is clear, the *Johnson* test of intent to procreate and raise the child may bring about unacceptable results. As an example, who is the natural parent if both a nongenetic-providing surrogate and the female genetic provider agree that they both intend to procreate and raise the child? It is apparent that the *Johnson* test presents problems when applied.

■ Nonetheless, ease of application should not be the central focus in structuring the law of surrogacy. The focus of parentage determination should be based on public policy. *Davis v. Davis* (Tenn.1992), 842 S.W.2d 588, 591. Surrogacy questions, such as this court has before it, involve questions of procreation and parentage. Those two subjects involve values that are basic to our society. Therefore, any new configuration of the law in those areas must be reconcilable with the values as are expressed in enunciated public policy of present law. The *Johnson* intent test fails to support, or is in conflict with, two areas of enunciated public policy.

The first area of conflict is surrender of parental rights by agreement. It has long been recognized that, as a matter of public policy, the state will not enforce or encourage private agreements or contracts to give up parental rights. Ingram, Surrogate Gestator: A New and Honorable Profession (1993), 76 Marquette L.Rev. 675. See *Matter of Baby M., supra;* 1983 Ohio Atty.Gen.Ops. No. 83–001; R.C. Chapter 3107. See, also, *Seymour v. Stotsky* (1992), 82 Ohio App.3d 87, 611 N.E.2d 454. Through the intent to procreate, the *Johnson* case allows the nongenetic carrier/surrogate to be designated as the natural mother. The possibility of recognition as a parent means that a potential right is implicit in any agreement or contract to act as gestational surrogate. A surrogate who chooses not to be the natural parent forfeits her right to be considered the natural and legal parent. Because a fee is often involved in a surrogacy service, that assent amounts to selling a parental right, and is in contradiction to the public policy against private contracts to surrender parental rights.

The second area of conflict involves several aspects of the underlying public policy of adoption law. Adoption laws of Ohio have long required that a relinquishing natural mother be given an unpressured opportunity before a disinterested magistrate to surrender her parental rights. R.C. 3107.08. Considering the substantial rights involved, the possible financial pressures, and the value our society places on procreation, the need for such procedures is evident.

In addition to protecting the interest of the mother, adoption law has attempted to protect the interest of the child. By agreement or otherwise, the natural mother is not free to surrender her child to whomever she wishes. Through the use of its *parens patriae* powers, the state closely supervises the process, and ultimately selects or approves of the new parents. See R.C. Chapter 3107; *State ex rel. Portage Cty. Welfare Dept. v. Summers* (1974), 38 Ohio St.2d 144, 67 O.O.2d 151, 311 N.E.2d 6. The underlying public policy is to provide for the best interest of the child: to ensure that the abandoned child is not given to persons who will abuse or neglect the child, but will be placed in a home with caring and competent parents.

Last, the adoption process promotes stability in the child-parent relationship. A court adjudication of adoption clearly ends the rights and responsibilities of the biological parents, and establishes those of the adopting parents. Such a process prevents a challenge to the rights and interests of the child and the parents at some later time. An underlying public policy of adoption law is to provide an adopted child with an unquestionable and certain status as to its relationship with those who are designated as the child's legal parents. R.C. 3107.15.

Due to the surrogate's similarity to an adopting parent, the same concerns that brought about the foregoing adoption procedure and public policy exist in surrogacy births in which the surrogate retains the child. The *Johnson* court's formulation of the intent-to-procreate test does not address those underlying concerns. It does not allow for unpressured surrender of potential parental rights, nor does it provide a means to review and ensure the suitability of the gestational surrogate or her spouse as parents. In addition, because it is based on private agreement or intent that has not been sanctioned by a court proceeding, it raises the question of future legal challenges, and thus undermines the stability of the child-parent relationship. The *Johnson* intent formulation ignores those concerns and relies on the whims of private intent and agreement. It is, in effect, a private adoption process that is readily subject to all the defects and pressures of such a process.

The final objection this court has to the *Johnson* intent-to-procreate test is its failure to fully recognize the genetic provider as having the right to choose or to consent. By subordinating the consent of the genetic-providing individual to the intent to procreate of the surrogate who intends to keep and raise the child, the *Johnson* court has deemphasized what should be considered a basic right. The procreation of a child, that is, the replication of the unique genes of an individual, should occur only with the consent of that individual. See *Davis v. Davis, supra,* 842 S.W.2d 588. The decision to allow implantation of another's egg and sperm with the understanding that the surrogate will raise the resulting child also involves the surrendering of parental rights. The consent to procreation and the

surrender of the right to raise a child of one's own genes must be considered the surrender of basic rights. *Id.* at 600. See, also, *Skinner v. Oklahoma* (1942), 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655.

The exercise of fundamental rights should not be taken lightly, and when the choice is made to exercise or not to exercise those rights, the law must protect that process of choice. *Davis v. Davis, supra; Griswold v. Connecticut* (1965), 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510; *Cruzan v. Director, Missouri Dept. of Health* (1990), 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224. A minimal protection for the basic rights of procreation, and the raising of a child of that procreation, should be to require consent to the surrender of those rights. At the very inception of the process of fertilization, the infertile couple who intends to raise the child and those who would procure the genetics and facilitate implantation should be put on notice that they must have the consent of the genetic provider. Such a clearly stated rule would prevent the involuntary use of an individual's genes. If we are to respect the right of procreation and parentage when a gestational surrogate is used, one of the first questions asked must concern consent of the genetic parents. The *Johnson* test fails to give that priority, and thus fails to provide adequate protection of basic rights.

Other than *Johnson v. Calvert* and *McDonald v. McDonald,* this court can find no precedent or basis in the law, by analogy or otherwise, for establishing a natural parent by intent to procreate. The use of the intent test is truly a new and questionable framework upon which to base the determination of parentage. If a break with traditional law and public policy, as represented by the *Johnson* test, is to be made part of the law of this state, it must be argued that the legislature, through the scrutiny of public hearings and debate, is better situated than a judicial proceeding to test the effectiveness and appropriateness of such a change.

Having rejected the *Johnson* test, this court must still provide a framework in which to decide this case. This court believes it to be more prudent to travel a known path and use existing law as a legal pattern to fashion new law.

As has been stated, there is abundant precedent for using the genetics test for identifying a natural parent. For the best interest of the child and society, there are strong arguments to recognize the genetic parent as the natural parent. The genetic parent can guide the child from experience through the strengths and weaknesses of a common ancestry of genetic traits. Because that test has served so well, it should remain the primary test for determining the natural parent, or parents, in nongenetic-providing surrogacy cases.

The test to identify the natural parents should be, "Who are the genetic parents?" When dealing with a nongenetic-providing surrogate, such a rule

minimizes or avoids the question of the surrogate selling her right to be determined the natural parent. Since she has not contributed to the genetics of the child, and the genetic parent or parents have not waived their rights, she cannot be determined the natural parent. She cannot sell a right she does not have. In addition, given the relative certainty of DNA blood testing, such a foundation or test for parental identity would be simpler to apply and more certain in results than a *Johnson*-type intent test.

■ However, a genetic test cannot be the only basis for determining who will assume the status of legal parent. The law must recognize the reality that the surrogate who did not provide the genetics of a child may wish to be the legal parent. There is precedent for recognition of her interest in becoming the legal parent. The law of parentage recognizes that someone other than the natural parent may assume the same legal status as the natural parent. *Barger, supra.* In other words, the natural parent may relinquish or consent to give up the rights and duties of parentage. The adoption laws of all fifty states are prime examples of that rule of law. R.C. Chapter 3107. A more recent example is the waiver of parental rights by a non-spousal artificial insemination anonymous donor under R.C. 3111.30 through 3111.38.

This concept should be recognized and applied to the identification of the legal parent of a child delivered by a nongenetic-providing surrogate. It should be applied when the gestational surrogate wishes to raise the child she has delivered. It must apply only with consent, or waiver of consent, of the genetic parents. What constitutes consent and the many issues surrounding the consent, and whether adoption procedures are applicable to the process of affirming the surrogate's status as legal parent are not before this court. Because the surrogate, Carol S. Clark, has failed to assert parental rights, and no evidence exists of a consent or waiver, the legal status of a nongenetic-providing surrogate who claims parental rights is not at issue. Therefore, this court cannot properly rule upon the issues involved in determining that status.[3]

Returning to the original query of this case, what identifies a natural parent when a child is conceived by the use of in vitro fertilization and the surrogate who delivers the child provides none of the genetics of that child? The answer of this court is that the individuals who provide the genes of that child are the natural parents. However, this court further recognizes that a second query must be made to determine the legal parents, the individual or individuals who will raise

---

**3.** Because that issue is not before the court, the law of nongenetic-providing surrogacy remains, in part, uncertain. Considering the facts that the legislature has the discretion of raising and legislating on issues of law, and that the adoption laws of this state are basically legislative enactments, it would be beneficial to the law of surrogacy for the legislature to act and end this uncertainty.

the child. That question must be determined by the consent of the genetic parents. If the genetic providers have not waived their rights and have decided to raise the child, then they must be recognized as the natural and legal parents. By formulating the law in this manner, both tests, genetics and birth, are used in determining parentage. However, they are no longer equal. The birth test becomes subordinate and secondary to genetics.

In conclusion, under Ohio law, when a child is delivered by a gestational surrogate who has been impregnated through the process of in vitro fertilization, the natural parents of the child shall be identified by a determination as to which individuals have provided the genetic imprint for that child. If the individuals who have been identified as the genetic parents have not relinquished or waived their rights to assume the legal status of natural parents, they shall be considered the natural and legal parents of that child.

Applying the foregoing law to the case at bar, this court has found that Anthony Belsito and Shelly Belsito are the genetic parents of the unborn child carried by Carol S. Clark, a gestational surrogate who was impregnated by in vitro fertilization. This court further finds that Anthony Belsito and Shelly Belsito have not waived their rights to be the natural and legal parents of that child. Therefore, this court must find, as a matter of law, that Anthony Belsito and Shelly Belsito are the natural and legal parents of the unborn child now carried by Carol S. Clark.

## JUDGMENT ORDER

IT IS THEREFORE THE ORDER OF THIS COURT, and this court does declare:

1. That Anthony Belsito and Shelly Belsito are the natural and legal parents of the child now carried by Carol S. Clark.

2. That the child is a legitimate child of Anthony Belsito and Shelly Belsito, and that, under the law of inheritance of this state, they may inherit through the child and the child may inherit through them.

3. That they have, in relationship to that child, all other rights and responsibilities that are entailed in a parent-child relationship.

4. That, based on the foregoing, an adoption proceeding under R.C. Chapter 3107 is unnecessary.

5. That upon the birth of the child, pursuant to this court's authority under R.C. 3705.09 and R.C. Chapter 2721, the birth certificate of the child shall list Anthony Belsito as father and Shelly Belsito as mother.

*So ordered.*