**J.F., Appellant,**

**v.**

**D.B. et al., Appellees.**

[Cite as *J.F. v. D.B.*, 165 Ohio App.3d 791, 2006-Ohio-1175.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 22709.

Decided March 15, 2006.

792

Richard E. Dobbins and Terrence E. Scanlon, for appellant.

Douglas N. Godshall, R. Brian Borla, and Joseph P. Martone, for appellees.

---

READER, Judge.

{¶ 1} Appellant, James Flynn, has appealed from the Summit County Court of Common Pleas, which granted summary judgment to appellees, Douglas and Danielle Bimber. This court reverses.

I

{¶ 2} Mr. and Mrs. Bimber signed a surrogacy contract with Flynn and one Jennifer Rice, in which they agreed that Mrs. Bimber would be implanted with fertilized embryos in exchange for $20,000 plus expenses. The surrogacy contract was titled "Contract between Biological Father, Egg Donor, and Surrogate Mother." The contract's opening provision designated James Flynn as the "Biological Father," Jennifer Rice as the "Egg Donor," and Danielle and Douglas Bimber, together, as the "Surrogate." A later section provides, "In the event that [Flynn] predeceases the birth of said child[ren], said child[ren] shall be placed in the custody of Eileen Donich." Dr. Donich is the fiancée of Flynn, but is not a party to the present lawsuit. Rice is not a party to the present lawsuit. It was anticipated that Flynn and Eileen Donich would raise the child(ren) as father and mother; neither Rice nor Mr. and Mrs. Bimber would seek any parental role. Three eggs, harvested from Rice, were fertilized with Flynn's sperm, and the zygotes were implanted into Mrs. Bimber, who carried all three to term and bore triplets on November 19, 2003, in Erie County, Pennsylvania. During the pregnancy, Flynn paid the Bimbers some $24,000 and made plans to bring the children home to Ohio. The parties' agreement, however, was not carried out.

{¶ 3} Mr. and Mrs. Bimber decided to keep the triplets. They also decided to keep the money paid by Flynn pursuant to the contract. Four separate legal actions ensued. This appeal stems from the fourth of those. In the first action, Flynn sued in Pennsylvania to recover the children and establish his right to sole custody. An Erie County (Pennsylvania) Court of Common Pleas declared the contract void, but then named Flynn the legal father because the contract

designated him as the father, and it named Mrs. Bimber the legal mother because the contract did not designate a mother. *J.F. v. D.B.* (Apr. 2, 2004), 66 Pa.D. & C.4th 1, 32.

{¶ 4} We note that deeming a contract void but then relying on that contract in the ensuing analysis is legally questionable. However, even had the court merely assigned Flynn and Mrs. Bimber the parental roles without purporting to rely on the contract, this approach would be unique in resolving this type of issue. "State courts and legal scholars have developed four different approaches for determining legal maternity in gestational surrogacy arrangements: (1) intent-based theory [California, Nevada, New York]; (2) genetic contribution theory [Ohio]; (3) gestational mother preference theory [North Dakota, Arizona]; and (4) the 'best interest of the child' theory [Michigan, Utah]." Larkey, "Redefining Motherhood: Determining Legal Maternity in Gestational Surrogacy Arrangements" (2003), 51 Drake L.Rev. 605, 622. See, also, Coleman, "Gestation, Intent, and the Seed: Defining Motherhood in the Era of Assisted Human Reproduction" (1996), 17 Cardozo L.Rev. 497, 505–29. The Pennsylvania court in this case did not follow any of the established theories.

{¶ 5} In addition, the Pennsylvania trial court refused to join Rice to the action, *J.F.*, 66 Pa.D. & C.4th at 4 fn. 4, but then ruled that she could not be named the children's mother "because she is not a party to this action." Id. at 24. The Pennsylvania court also ruled that Donich could not be named the children's mother because she "is not genetically related to them, nor is she even married to [Flynn]." Id. Mrs. Bimber, however, was named the children's mother despite being neither genetically related to the triplets nor married to Flynn. The outcome was an order that Mrs. Bimber could pursue custody of the triplets and could also seek child support from Flynn. Id. at 33.

{¶ 6} In the second of these legal actions, the egg donor, Rice, sued in Ohio to establish that she is the legal mother of the children and that Mr. and Mrs. Bimber are not the children's parents. The Summit County (Ohio) Court of Common Pleas, Domestic Relations Division, ruled that Flynn and Rice are the parents under Ohio law, pursuant to *Belsito v. Clark* (1994), 67 Ohio Misc.2d 54, 644 N.E.2d 760, but that it lacked jurisdiction over any custody issue because the Pennsylvania court had continuing exclusive jurisdiction over that matter. *Rice v. Flynn* (Oct. 29, 2004), Summit C.P. No. 2004–04–1561, at 6. On appeal, this court held that the Summit County Common Pleas Court was not bound to give full faith and credit to the Pennsylvania decision because of the Pennsylvania court's failure to include Rice in the action. *Rice v. Flynn*, 9th Dist. No. 22416, 2005-Ohio-4667, 2005 WL 2140576, at ¶ 27, 32. In the opinion, this court also upheld the application of the two-prong *Belsito* test and ordered the trial court to complete the second prong on remand. Id. at ¶ 41 ("Under the *Belsito* test, a

court first determines genetics and then determines if the genetic parents waived or relinquished parental rights"). In so holding, this court implicitly adopted the *Belsito* test as the prevailing law on gestational surrogacy, becoming the first appellate court in Ohio to do so.

{¶ 7} In the third legal action, the Pennsylvania Common Pleas Court continued to rule on the case, awarding primary custody to Mr. and Mrs. Bimber and ordering, among other things, that Flynn pay them child support. *Flynn v. Bimber* (Jan. 7, 2005), 70 Pa.D. & C.4th 261, 309–12. We again note that the legal analysis utilized by the Pennsylvania court is questionable under both Ohio and Pennsylvania precedent. To wit, a married woman bore a child during marriage and, with the marriage still in effect, the court granted a third-party to the marriage partial custody of the child and ordered him to pay the married couple child support for that child. See id.

{¶ 8} Ordinarily, a child born during a marriage is presumed to be the child of the husband. *Michael H. v. Gerald D.* (1989), 491 U.S. 110, 128–30, 109 S.Ct. 2333, 105 L.Ed.2d 91. This is a strongly guarded presumption in Ohio. See *Thomas v. Cruz,* 9th Dist No. 03CA008247, 2003-Ohio-6011, 2003 WL 22657864, ¶ 14 (disallowing genetic tests to disprove the presumption that the husband was the father of the child conceived during the marriage). See, also, R.C. 3111.03(A)(1); R.C. 3111.95(A). In Pennsylvania, this presumption is even stronger than in Ohio: "the presumption is *irrefutable* where the mother, child and husband live together as an intact family, with the husband assuming parental responsibility." (Emphasis added.) *Miscovich v. Miscovich* (1997), 455 Pa.Super. 437, 444–45, 688 A.2d 726, affirmed. (1998), 554 Pa. 173, 720 A.2d 764.

{¶ 9} Mrs. Bimber was then and is now married to Douglas Bimber. Flynn never engaged in coitus with Mrs. Bimber; doctors fertilized Rice's embryos in a lab and impregnated Mrs. Bimber by surgically implanting the resulting zygotes into her uterus. In fact, Flynn and Mrs. Bimber had no relationship at all, beyond the arms-length surrogacy-contract negotiation. The Pennsylvania court created a father-and-mother relationship. The Pennsylvania court even ordered Flynn to attend a divorce counseling seminar with Mrs. Bimber, to benefit the children, though Mr. Bimber was not ordered to attend. Id. at 313.

{¶ 10} In the present case, Mrs. Bimber "*and her husband* went through monitor training and car seat testing and overnight nesting with the triplets. They continue to care for the triplets plus three other children *in their home.*" (Emphasis added.) *J.F.,* 66 Pa.D. & C.4th at 27. They recorded Douglas's surname, "Bimber," on the birth certificates (Danielle's maiden name is Walsh). *Flynn,* 70 Pa.D. & C.4th at 273. Thus, "mother, child and husband live together as an intact family, with the husband assuming parental responsibility." *Miscovich,* 455 Pa.Super. at 444–45, 688 A.2d 726. See, also, *John M. v. Paula T.*

(1990), 524 Pa. 306, 312, 571 A.2d 1380; West, "Maintaining the Legal Fiction: Application of the Presumption of Paternity and Paternity by Estoppel in Pennsylvania" (2004), 42 Duq.L.Rev. 577, 587. Under these circumstances, once the court declared Mrs. Bimber the mother, Pennsylvania and Ohio law presume that Mr. Bimber is the father.

{¶ 11} Similarly, a finding that Mrs. Bimber is the legal mother relegates Rice to no more than the egg donor. From such a predicate finding and the legal presumption that Mr. Bimber is the father, it follows logically that Flynn would be relegated to nothing more than a sperm donor. To mix and match at random is to undermine any comprehensible scheme by which future cases may be analyzed. We also recognize the potential Equal Protection violation inherent in this issue: Flynn and Rice both contributed genetic material to a laboratory for reproductive fertilization, and neither engaged in coitus with Mrs. Bimber. To hold Flynn, but not Rice, responsible for child support seems to treat similarly situated parties differently on the basis of gender. See *Caban v. Mohammed* (1979), 441 U.S. 380, 386, 394, 99 S.Ct. 1760, 60 L.Ed.2d 297.

{¶ 12} Consequently, in the fourth action, Flynn sued in Ohio under the terms of the contract to recover the money paid to the Bimbers and the money ordered due as child support. The Summit County (Ohio) Court of Common Pleas, General Division, declared the contract provisions void as against public policy and refused to enforce them, thus granting summary judgment to the Bimbers. Flynn appealed to this court, asserting a single assignment of error for review.

## II

### Assignment of Error

The trial court erred in granting judgment in favor of the defendant-appellees, Danielle and Douglas Bimber.

{¶ 13} Flynn alleges that the trial court erred in granting the Bimbers' summary judgment and refusing to find them in breach of contract. Flynn argues that this particular contract does not offend public policy in the way described by the trial court, and this court agrees. From this argument, Flynn contends that (1) the Bimbers' decision to keep the children was a breach of contract that (2) entitles him to reimbursement of the money he paid to them to perform their promise on the contract, and (3) the indemnity clause makes Mr. and Mrs. Bimber answerable for liability (e.g., court-ordered child support) resulting from their decision to breach the contract. This court agrees with all three contentions.

{¶ 14} Appellate courts review decisions on summary judgment de novo, viewing the facts as most favorable to the nonmoving party and resolving any

doubt in favor of that party. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241; *Norris v. Ohio Std. Oil Co.* (1982), 70 Ohio St.2d 1, 2, 24 O.O.3d 1, 433 N.E.2d 615. Summary judgment is proper if there is no genuine dispute of a material fact so that the issue is a matter of law and reasonable minds could come to but one conclusion, that being in favor of the moving party. Civ.R. 56(C); *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 364 N.E.2d 267. Similarly, courts construe contract language as a matter of law, and, therefore, appellate review is de novo. See *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph one of the syllabus. "In construing an agreement, the court should prefer a meaning which gives it vitality rather than a meaning which renders its performance illegal or impossible." *Kebe v. Nutro Mach. Corp.* (1985), 30 Ohio App.3d 175, 177, 30 OBR 316, 507 N.E.2d 369, citing *State ex rel. Gordon v. Taylor* (1948), 149 Ohio St. 427, 37 O.O. 112, 79 N.E.2d 127, paragraph two of the syllabus. See, also, *GZK, Inc. v. Schumaker Ltd. Partnership*, 2nd Dist. No. 19764, 2003-Ohio-5842, 2003 WL 22461779, at ¶ 20.

{¶ 15} Factually, it is indisputable that Mr. and Mrs. Bimber breached the contract. Section 2 states that Mr. and Mrs. Bimber "will not attempt to form a parent-child relationship"; Section 3 states that they will "sign any and all necessary adoption papers, consents, affidavits, and other documents to effectuate the interests and purposes of this agreement"; and the release-and-hold-harmless agreement states that Mr. and Mrs. Bimber "will surrender any custody rights to the child[ren]." The Bimbers broke these promises. As the Pennsylvania court found:

> [Mrs. Bimber] has assumed parental duties when she could have simply taken her surrogacy fee and walked away. She was not legally obligated to provide care or child support, yet she took on those responsibilities willingly and voluntarily. She and her husband went through monitor training and car seat testing and overnight nesting with the triplets. They continue to care for the triplets plus three other children in their home. It does not appear to the court that [Mrs. Bimber] was pressured or talked into bringing the triplets home with her or that she is unable to handle the responsibility of being a legal mother to [them].

*J.F.*, 66 Pa.D. & C.4th at 27. Therefore, Mr. and Mrs. Bimber attempted to and did form parent-child relationships with the children (Section 2), they failed to sign the necessary documents (Section 3), and they not only refused to surrender custody but, after secreting the children away from Flynn, actually sought to formalize legal custody in court.

{¶ 16} Despite the evident breach, the Summit County Common Pleas Court refused to enforce the contract on the basis that it found this particular

contract to violate Ohio's public policy. We first note that the concept of surrogacy, in general, has not been deemed to offend Ohio's public policy. It is the role of the legislature to define public policy. *Bengala v. Doe*, 7th Dist. No. 02CA166, 2003-Ohio-7104, 2003 WL 23018545, at ¶ 30, citing *Williams v. Scudder* (1921), 102 Ohio St. 305, 131 N.E. 481, syllabus. See, also, *Hancock Mut. Life Ins. Co. v. Warren* (1901), 181 U.S. 73, 76–77, 21 S.Ct. 535, 45 L.Ed. 755 ("It [is] for the legislature of Ohio to define the public policy of that state * * *"). The Ohio legislature has not acted to limit or prohibit surrogacy. See R.C. 3111.89 (acknowledging "surrogate motherhood" without regulating it). See, also, Pierce–Gealy, "'Are You My Mother?': Ohio's Crazy–Making Baby–Making Produces a New Definition of 'Mother'" (1995), 28 Akron L.Rev. 535, 544.

■ {¶ 17} The Summit County Common Pleas Court found that the provisions at issue were in violation of Ohio's public policy against private agreements to forgo parental rights. See R.C. 3107.10. However, at the time of contract formation (as well as at the time the Bimbers breached the contract), neither Mr. nor Mrs. Bimber had established parental rights under Ohio law. Notably, both Mr. and Mrs. Bimber signed the contract, which included a choice-of-law provision: "SECTION 31. The parties agree that this agreement shall be governed by and enforced in accordance with the laws of the State of OH." Choice-of-law provisions are enforceable. See *Schulke Radio Prods., Ltd. v. Midwestern Broadcasting Co.* (1983), 6 Ohio St.3d 436, 6 OBR 480, 453 N.E.2d 683, syllabus; *Ohayon v. Safeco Ins. Co.* (2001), 91 Ohio St.3d 474, 477, 747 N.E.2d 206 ("subject to very limited exceptions, the law of the state chosen by the parties to a contract will govern their contractual rights and duties").

■ {¶ 18} Under Ohio law, "the individuals who provide the genes of that child are the natural parents," and "[i]f the genetic providers have not waived their rights and have decided to raise the child, then they must be recognized as the natural and legal parents." *Belsito*, 67 Ohio Misc.2d at 65–66, 644 N.E.2d 760. Flynn and Rice were the genetic providers, so Flynn and Rice were the children's parents under Ohio law. The Bimbers were not the children's parents, so the Bimbers had no parental rights to contract away. At the time the parties entered into the surrogacy contract, the Bimbers' legal status was as a disinterested third party, akin to a caretaker. The fact that they later obtained custody in a Pennsylvania court does not retroactively grant the Bimbers the status of parents at the time they signed or breached the contract. Similarly, even though the Pennsylvania court later designated Mrs. Bimber as the legal mother,[1] see

---

1. The Pennsylvania court's designation of Mrs. Bimber as the legal mother is referred to for analysis of the present issue, but this reference is not an implicit adoption of that designation. As was explained above, Ohio courts are not bound to give full faith and credit to that

*J.F.*, 66 Pa.D. & C.4th at 32, it did not designate Mr. Bimber as the legal father. Therefore, Mr. Bimber has never been deemed to hold parental rights. When the Bimbers contracted with Flynn, they did not contract away any parental rights, and therefore, the surrogacy contract they signed in this case does not violate public policy on that basis.

{¶ 19} In anticipation of the Bimbers' breaching the contract, the parties included contract provisions that set out specific remedies in the event of such a breach:

> SECTION 19. In the event that [Mr. and Mrs. Bimber] violate any of the provisions herein, [Flynn] may, at his option, terminate this contract without any further liability thereunder to the breaching party. In the event that this contract is terminated because of a breach by [Mr. and Mrs. Bimber], [they] shall be liable for any and all monies expended on [their] behalf, plus attorney fees.

Therefore, based on the undisputed evidence that the Bimbers breached the contract and this court's conclusion that the contract is enforceable, the Bimbers are liable for restitution of the monies paid by Flynn, as well as attorney fees, as may be determined by the common pleas court on remand.

{¶ 20} The child-support provision of the parties' contract presents a slightly different issue. The Summit County Common Pleas Court found that the contract's indemnification provision "violates Ohio's public policy prohibiting parents from abrogating their obligations to support their children through a private agreement." The trial court relied on cases in which parties to a parental relationship attempted to abrogate their obligation to support the children resulting from their marriage. See, e.g., *Byrd v. Byrd* (1969), 20 Ohio App.2d 183, 49 O.O.2d 248, 252 N.E.2d 644 (attempted divorce decree); *Lowman v. Lowman* (1956), 166 Ohio St. 1, 1 O.O.2d 152, 139 N.E.2d 1 (attempted marital-separation agreement); *Children's Hosp. v. Johnson* (1980), 68 Ohio App.2d 17, 22 O.O.3d 11, 426 N.E.2d 515 (provision of a divorce decree). The circumstances of this case and this contract are different. Flynn was never married to Mrs. Bimber; in fact, he had no coital relationship with her at all and did not even fertilize an embryo of hers via the laboratory procedure. Therefore, these cases and the cited policy provide little guidance for the present case. Instead, we look to the contract for a reading that gives it vitality rather than one that renders its performance illegal. See *Kebe*, 30 Ohio App.3d at 177, 30 OBR 316, 507 N.E.2d 369, citing *State ex rel. Gordon*, 149 Ohio St. at 427, 37 O.O. 112, 79 N.E.2d 127, paragraph two of the syllabus.

---

decision. *Rice v. Flynn*, 9th Dist. No. 22416, 2005-Ohio-4667, 2005 WL 2140576, at ¶ 27, 32. The present decision does not decide the parental rights at issue in that case.

{¶ 21} In drafting the contract, the parties apparently anticipated that the Bimbers might breach the agreement and obtain legal custody of the children and therefore provided for a specific remedy in the event of such an occurrence:

> SECTION 15. In the event that custody is awarded to [Mr. and Mrs. Bimber], [Flynn] shall be indemnified by [Mr. and Mrs. Bimber] for any and all monies he is required to pay for child support, or pregnancy expenses pursuant to court order. [Flynn] shall be entitled to immediate reimbursement from [Mr. and Mrs. Bimber] for all monies and/or other forms of consideration paid to [the Bimbers] pursuant to this agreement.

This is not an abrogation of an obligation to support the offspring of a coital relationship; it is recognition that since a surrogate is not a parent, if the Bimbers decide to seek and obtain custody of the child (or children), then they would become the legal parents and no longer merely the surrogate. That is, the surrogacy agreement would terminate, and under the agreement Flynn would be treated as merely the sperm donor and not the parent.[2] Under Ohio law, a sperm donor is not obligated to support a child conceived by artificial insemination:

> If a woman is the subject of a non-spousal artificial insemination, the donor shall not be treated in law or regarded as the natural father of a child conceived as a result of the artificial insemination, and a child so conceived shall not be treated in law or regarded as the natural child of the donor.

R.C. 3111.95(B). Therefore, we do not conclude that this indemnification provision violates public policy. Mr. and Mrs. Bimber acted on their opportunity to get custody of the children, as was anticipated by Section 15 of the contract, and in so doing triggered the indemnification that they had agreed would accompany that action. To the extent that the Bimbers have obtained custody of the children, they must indemnify Flynn for any court-ordered expenses associated with that custody, as they agreed to do under the contract.

{¶ 22} This court holds that Mr. and Mrs. Bimber breached the contract and that the contract is enforceable under Ohio law. Therefore, the remedies foreseen by the parties in forming the contract are also enforceable. Flynn is entitled to reimbursement of the $20,000 plus expenses that he has paid as performance for his part of the contract. Moreover, Mr. and Mrs. Bimber are liable to Flynn for all monies that he has been required to pay to them by court order, such as child support, as will be determined on remand. Finally, Flynn is entitled to attorney fees to the extent that he may be able to prove those fees to the common pleas court on remand.

---

2. Out of an abundance of caution, we again note that this decision does not attempt to determine the parties' parental rights.

## III

{¶ 23} Flynn's assignment of error is sustained. The decision of the Summit County Court of Common Pleas is reversed, and the cause is remanded for further proceedings consistent with this decision.

Judgment reversed
and cause remanded.

SLABY, P.J., and MOORE, J., concur.

SLABY, Presiding Judge, concurring.

{¶ 24} I fully concur with the majority. I write separately to stress that although this case was decided on contract law, there are many inherent concerns about the rights of the various parties involved. The issues that the courts of the future will be faced with began in 1988 with the case of *In re Baby M.* (1988), 109 N.J. 396, 537 A.2d 1227. *Baby M* was decided on a violation of public policy of the state of New Jersey. The Ohio legislators have acknowledged but failed to address the rapid technological advances of surrogacy. The majority and I want to again emphasize that we do not address custody issues in this case. The case is the foundation of many and various issues to be decided by the state legislators or courts of the future. Extrapolating from the facts of this case, one can only imagine what the future can bring, the issues that will be raised, and the variety of conclusions that can result without legislative regulation.

{¶ 25} The majority points out that there are only a few states that have even begun to address the issue of determining who the parents of a surrogate child may be. Even the few states that have begun to address the issues involved have approached the issues from four different directions. Unless the state legislators begin to address the multiple issues involved, it will be the children that will be caught in a continual tug of war between the egg donor or donors, the sperm donor or donors, the surrogate parent or parents, and those that simply want to adopt a child from what they perceive as the ideal parents.

READER, J., retired of the Fifth District Court of Appeals, sitting by assignment.